GROCH ET AL. *v.* GENERAL MOTORS CORPORATION ET AL.

[Cite as *Groch v. Gen. Motors Corp.,* 117 Ohio St.3d 192, 2008-Ohio-546.]

(No. 2006–1914—Submitted September 19, 2007—Decided February 21, 2008.)

O'CONNOR, J.

{¶ 1} This case comes to us as certified questions of state law from the United States District Court for the Northern District of Ohio, Western Division. For the reasons that follow, we answer the certified questions by holding that R.C. 4123.93, 4123.931, 2305.10(C), and former 2305.10(F) (now (G)) are all facially constitutional on the challenges to those statutes asserted in this case. However, we determine that Section 28, Article II of the Ohio Constitution (the ban on retroactive laws) prevents R.C. 2305.10(C) and former 2305.10(F) from applying

to the specific facts of this case. We therefore uphold an "as applied" challenge to those statutes and invalidate former R.C. 2305.10(F) in part.

# I

## Relevant Background

### A. The Certification Order and the Questions to Be Answered

{¶ 2} The federal district court's initial certification order reads as follows:

{¶ 3} "There are issues of Ohio law that may be determinative of the present case and for which there is no controlling precedent in the decisions of the Supreme Court of Ohio. Therefore, this Court finds it appropriate to certify questions of Ohio law to the Supreme Court of Ohio.

## "A. NAME OF THE CASE AND NAMES OF ALL PARTIES

{¶ 4} "The name of this case is *Douglas Groch, et al. v. General Motors Corporation, et al.* case number 3:06–CV–1604. The parties in this case are: Plaintiffs Douglas Groch and Chloe Groch versus Defendants General Motors Corporation, Kard Corporation and Racine Federated, Inc. The Attorney General of Ohio is a party for purposes of defending the constitutionality of the Ohio statutes at issue.

## "B. BRIEF STATEMENT OF FACTS

{¶ 5} "The Amended Complaint alleges the following: Plaintiff Douglas Groch ('Groch') was injured on March 3, 2005 when the trim press he was operating came down on his right arm and wrist. At the time of his injury Plaintiff Douglas Groch was acting in the course and scope of his employment with Defendant General Motors Corporation. The trim press that he was using was manufactured by Defendants Kard Corporation and Racine Federated, Inc.

{¶ 6} "Groch brought an action in the Court of Common Pleas, Lucas County, Ohio seeking damages from Defendant General Motors Corporation ('GM') based on a theory of employer intentional tort and from Defendants Kard Corporation and Racine Federated, Inc. (respectively, 'Kard' and 'Racine') based on a theory of product liability. Plaintiff Chloe Groch ('Chloe') sought damages for loss of consortium.

{¶ 7} "The action was removed to federal court by GM. Federal jurisdiction is based on 28 U.S.C. 1332 because there is diversity between the Plaintiffs and the Defendants, and the amount in controversy exceeds $75,000.00.

{¶ 8} "GM has asserted a subrogation interest in Groch's recovery for its payment to him of workers' compensation benefits. Groch asserts that the Ohio statutes granting GM subrogation interests—R.C. 4123.93 and R.C. 4123.931— are unconstitutional. To fully adjudicate this matter and determine the rights

and liabilities of each party, this Court needs a determination by the Ohio Supreme Court regarding the constitutionality of the statutes under the Ohio Constitution. The Supreme Court of Ohio has not yet had opportunity to issue a decision on the constitutionality of R.C. 4123.93 and R.C. 4123.931, passed as Senate Bill 227 and made effective in April 2003. Therefore, this Court certifies questions 1 through 3 to the Supreme Court of Ohio.

{¶ 9} "Kard and Racine assert that they are immune from liability based on the statute of repose for products liability claims provided at R.C. 2305.10. To fully adjudicate this matter and fully determine the rights and liabilities of each party, this Court needs a determination by the Ohio Supreme Court regarding the constitutionality of the statutes under the Ohio Constitution. The Supreme Court of Ohio has not yet had opportunity to issue a decision on the constitutionality of R.C. 2305.10, passed as Senate Bill 80, and made effective in April, 2005. Therefore this Court certifies [an additional five questions] to the Supreme Court of Ohio."

{¶ 10} Shortly after issuing that order, the district court issued an amended order that certified an additional ninth question regarding the constitutionality of 2004 Am.Sub.S.B. No. 80.

{¶ 11} This court reviewed the parties' preliminary memoranda and determined that it would answer all nine certified questions, numbering them as follows:

{¶ 12} "1. Do the statutes allowing subrogation for workers' compensation benefits, R.C. 4123.93 and 4123.931, violate the takings clause, Article I, Section 19, of the Ohio Constitution?

{¶ 13} "2. Do R.C. 4123.93 and 4123.931 violate the due process and remedies clause, Article I, Section 16, of the Ohio Constitution?

{¶ 14} "3. Do R.C. 4123.93 and 4123.931 violate the equal protection clause, Article I, Section 2 of the Ohio Constitution?

{¶ 15} "4. Do R.C. 2305.10(C) and (F) violate the open courts provision of Article I, Section 16, of the Ohio Constitution?

{¶ 16} "5. Do R.C. 2305.10(C) and (F) violate the takings clause, Article I, Section 19, of the Ohio Constitution?

{¶ 17} "6. Do R.C. 2305.10(C) and (F) violate the due process and remedies clause, Article I, Section 16, of the Ohio Constitution?

{¶ 18} "7. Do R.C. 2305.10(C) and (F) violate the equal protection clause, Article I, Section 2, of the Ohio Constitution?

{¶ 19} "8. Do R.C. 2305.10(C) and (F) violate the ban on retroactive laws, Article II, Section 28 of the Ohio Constitution?

{¶ 20} "9. Does Senate Bill 80 violate the one-subject rule, Article II, Section 15, of the Ohio Constitution?" 112 Ohio St.3d 1416, 2006-Ohio-6712, 859 N.E.2d 556.

{¶ 21} Plaintiffs Douglas and Chloe Groch are the petitioners in this matter. The respondents are defendants General Motors Corporation, Kard Corporation, and Racine Federated, Inc., and the state of Ohio, represented by the attorney general. A number of amicus curiae briefs ably support their arguments.

## B. Introduction of Analysis

{¶ 22} The first three questions focus on whether the General Assembly's statutory response to this court's decision in *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 748 N.E.2d 1111, which held the previous workers' compensation subrogation statute unconstitutional, complies with several cited provisions of the Ohio Constitution. These questions are answered in Part II of this opinion. The next five questions focus on the constitutionality of R.C. 2305.10, the statute of repose for products-liability actions, enacted as part of the tort-reform legislation of Am.Sub.S.B. No. 80 of the 125th General Assembly ("S.B. 80"), effective April 7, 2005. These five questions, along with the ninth question concerning whether S.B. 80 violates the one-subject rule of the Ohio Constitution, are answered in Part III of this opinion.

{¶ 23} This court's recent decision in *Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, is useful in setting the stage. *Arbino* provides extensive background and establishes some important concepts that play a significant role in resolving the final six questions. Therefore, a brief review of *Arbino* is in order at this point, with more extensive consideration in Part III.

{¶ 24} *Arbino,* like the present case, was before this court on certified questions from a federal district court. In *Arbino,* we resolved questions on the constitutionality of two tort-reform statutes enacted by S.B. 80—R.C. 2315.18, limiting noneconomic damages in tort actions, and R.C. 2315.21, limiting punitive damages in tort actions. Before analyzing the facial constitutional challenges, this court reiterated the well-established standard of review, stating at ¶ 25:

{¶ 25} "It is difficult to prove that a statute is unconstitutional. All statutes have a strong presumption of constitutionality. See *Sorrell* [*v. Thevenir* (1994) ], 69 Ohio St.3d [415] at 418–419, 633 N.E.2d 504. Before a court may declare unconstitutional an enactment of the legislative branch, 'it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible.' *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus."

{¶ 26} In addition, a party raising a facial challenge must demonstrate that there is no set of circumstances in which the statute would be valid. *Arbino* at

¶ 26, citing *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37, and *United States v. Salerno* (1987), 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697. " 'The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid.' " *Arbino* at ¶ 26, quoting *Harrold* at ¶ 37.

{¶ 27} These considerations apply to most of the certified questions in this case. However, petitioners also raise an "as applied" constitutional challenge in one of the certified questions, which is governed by a different standard, and which we will address in Part III.

## II

### Constitutionality of R.C. 4123.93 and 4123.931

{¶ 28} In *Holeton*, 92 Ohio St.3d 115, 748 N.E.2d 1111, this court held that former R.C. 4123.931, a workers' compensation subrogation statute enacted in 1995, was unconstitutional on a number of grounds.[1] After our decision in *Holeton*, the General Assembly repealed the 1995 statutes and enacted the subrogation statutes at issue in this case in 2002 Sub.S.B. No. 227. 149 Ohio Laws, Part II, 3716. The statutes became effective on April 9, 2003. See *Modzelewski v. Yellow Freight Sys., Inc.*, 102 Ohio St.3d 192, 2004-Ohio-2365, 808 N.E.2d 381, ¶ 7, fn. 1.

{¶ 29} Five days after S.B. 227's effective date, a mandamus action challenging the constitutionality of the subrogation statutes at issue here was filed in the Tenth District Court of Appeals. In *State ex rel. United Auto., Aerospace & Agricultural Implement Workers of Am. v. Bur. of Workers' Comp.*, 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, we affirmed the judgment of the court of appeals dismissing the complaint in mandamus because the relator had adequate remedies by way of declaratory judgment and prohibitory injunction. Id. at ¶ 62.

{¶ 30} In *United Auto.*, this court discussed the statute held unconstitutional in *Holeton* and summarized that decision at ¶ 2–13:

{¶ 31} "Under R.C. 4123.931(A), the payment of workers' compensation benefits 'creates a right of recovery in favor of a statutory subrogee against a third party, and the statutory subrogee is subrogated to the rights of a claimant against that third party.' The 'statutory subrogee' is 'the administrator of

---

1. Because *Holeton* held the 1995 statute unconstitutional, the previous subrogation statute, enacted in 1993, then became effective. See *Modzelewski v. Yellow Freight Sys., Inc.*, 102 Ohio St.3d 192, 2004-Ohio-2365, 808 N.E.2d 381, ¶ 7, fn. 1. In *Modzelewski*, at the syllabus, we held that the 1993 statute was unconstitutional as well.

workers' compensation, a self-insuring employer, or an employer that contracts for the direct payment of medical services.' R.C. 4123.93(B).

{¶ 32} "Former R.C. 4123.931(A) specified: 'A statutory subrogee's subrogation interest includes * * * estimated future values of compensation and medical benefits arising out of an injury to or disability or disease of a claimant.' See 1995 Am.Sub.H.B. No. 278, 146 Ohio Laws, Part II, 3596.

{¶ 33} "Former R.C. 4123.931(D) further provided:

{¶ 34} " 'The entire amount of any settlement or compromise of an action or claim is subject to the subrogation right of a statutory subrogee, regardless of the manner in which the settlement or compromise is characterized. Any settlement or compromise that excludes the amount of compensation or medical benefits shall not preclude a statutory subrogee from enforcing its rights under this section. The entire amount of any award or judgment is presumed to represent compensation and medical benefits and future estimated values of compensation and medical benefits that are subject to a statutory subrogee's subrogation rights unless the claimant obtains a special verdict or jury interrogatories indicating that the award or judgment represents different types of damages.' Id. at 3596–3597.

{¶ 35} "In June 2001, in *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 135, 748 N.E.2d 1111, we held that former R.C. 4128.931 [sic, 4123.931] violated Sections 2, 16, and 19, Article I of the Ohio Constitution.

{¶ 36} "More specifically, we held: 'By giving the subrogee a current collectible interest in estimated future expenditures, [former] R.C. 4123.931(A) creates the conditions under which a prohibited taking may occur. This would happen in those situations where the amount of reimbursement for "estimated future values of compensation and medical benefits" proves to be substantially greater than the subrogee's eventual compensation outlay. In other words, [former] R.C. 4123.931(A) requires the claimant to reimburse the bureau or self-insuring employer for future benefits that the claimant may never receive. In that event, the statute operates not to prevent the claimant from keeping a double recovery but to provide the statutory subrogee with a windfall at the expense of the claimant's tort recovery.' Id. at 123, 748 N.E.2d 1111.

{¶ 37} "In addition, we held:

{¶ 38} " '[Former] R.C. 4123.931(D) establishes a procedural framework under which an unconstitutional taking of the claimant's property or a denial of remedy by due course of law can occur. This framework distinguishes between third-party claims that are tried and third-party claims that are settled. In the case where an award or judgment is rendered in the third-party action, [former] R.C. 4123.931(D) allows the claimant to obtain jury interrogatories segregating dam-

ages that do not represent workers' compensation or medical benefits and, therefore, are not subject to the reimbursement right of the statutory subrogee. In contrast, the entire amount of any settlement or compromise is deemed subject to the reimbursement right of the statutory subrogee, and the claimant is precluded, under any circumstances, from showing that his or her settlement or portions thereof do not represent or duplicate workers' compensation or medical benefits.

{¶ 39} " ' * * * [Former] R.C. 4123.931(D) operates unconstitutionally * * * because it allows for reimbursement from proceeds that do not constitute a double recovery.' Id., 92 Ohio St.3d at 125–126, 748 N.E.2d 1111; see, also, *Modzelewski v. Yellow Freight Sys., Inc.*, 102 Ohio St.3d 192, 2004-Ohio-2365, 808 N.E.2d 381, holding former R.C. 4123.93 unconstitutional.

{¶ 40} "In *Holeton*, 92 Ohio St.3d at 135, 748 N.E.2d 1111, despite holding the statute unconstitutional, we expressly noted that workers' compensation subrogation statutes are not per se unconstitutional and that we were addressing only the specific provisions in former R.C. 4123.931:

{¶ 41} " 'We hold * * * that [former] R.C. 4123.931 does violate Sections 2, 16, and 19, Article I of the Ohio Constitution. In so holding, we do not accept the proposition that a workers' compensation subrogation statute is *per se* unconstitutional, and nothing in this opinion shall be construed to prevent the General Assembly from ever enacting such a statute. We hold only that [former] R.C. 4123.931, in its present form, is unconstitutional.'

{¶ 42} "We also recognized that 'virtually every jurisdiction provides some statutory mechanism enabling the employer or fund to recover its workers' compensation outlay from a third-party tortfeasor.' Id. at 120, 748 N.E.2d 1111."

{¶ 43} *United Auto.*, 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, at ¶ 14–17, also cogently summarized current R.C. 4123.931:

{¶ 44} "Following *Holeton*, the General Assembly enacted 2002 Sub.S.B. No. 227 ('S.B. 227'), which amended the subrogation provisions in R.C. 4123.93 and 4123.931, effective April 9, 2003.

{¶ 45} "S.B. 227 repealed the former provisions in R.C. 4123.931(A) and (D) that we had found unconstitutional in *Holeton* and set forth a new settlement procedure in which a claimant would receive 'an amount equal to the uncompensated damages divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered.' R.C. 4123.931(B). The statutory subrogee would receive 'an amount equal to the subrogation interest divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered.' Id. The claimant and statutory

subrogee can instead agree to divide the net amount recovered on a more fair and reasonable basis. Id.

{¶ 46} "In addition, S.B. 227 permits claimants to 'establish an interest-bearing trust account for the full amount of the subrogation interest that represents estimated future payments of compensation, medical benefits, rehabilitation costs, or death benefits, reduced to present value, from which the claimant shall make reimbursement payments to the statutory subrogee for the future payments of compensation, medical benefits, rehabilitation costs, or death benefits.' R.C. 4123.931(E)(1).

{¶ 47} "The manifest objective of the General Assembly in enacting S.B. 227 was to comply with our holding in *Holeton.* See, generally, Legislative Service Commission, Bill Analysis of 2002 S.B. 227."

{¶ 48} Petitioners in this case argue that the current subrogation statutes violate the same constitutional provisions cited in *Holeton.* The key statute challenged is R.C. 4123.931, which sets forth the right of subrogation and which details how that right is implemented. The other statute at issue, R.C. 4123.93, defines terms appearing in R.C. 4123.931.

### A. The Takings Clause and the Due Process and Remedies Clauses (Section 19, Article I, and Section 16, Article I, Ohio Constitution)

{¶ 49} The first certified question is whether the subrogation statutes violate Section 19, Article I of the Ohio Constitution, which provides, "Private property shall ever be held inviolate, but subservient to the public welfare. * * * [W]here private property shall be taken for public use, a compensation therefor shall first be made."

{¶ 50} Section 19 requires that " 'legislation must be reasonable, not arbitrary, and must confer upon the public a benefit commensurate with its burdens upon private property.' " *Holeton,* 92 Ohio St.3d at 121, 748 N.E.2d 1111, quoting *Direct Plumbing Supply Co. v. Dayton* (1941), 138 Ohio St. 540, 546, 21 O.O. 422, 38 N.E.2d 70. See, also, *Froelich v. Cleveland* (1919), 99 Ohio St. 376, 391, 124 N.E. 212 (laws "must be suitable to the ends in view, they must be impartial in operation, and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation").

{¶ 51} The second certified question is whether the subrogation statutes violate the Due Process and Remedies Clauses, Section 16, Article I of the Ohio Constitution, which provides that "every person, for an injury done * * *, shall have remedy by due course of law."

{¶ 52} The rights encompassed by the "remedy" aspect of Section 16, Article I are well settled. " 'When the Constitution speaks of remedy and injury to person, property, or reputation, it requires an opportunity granted at a meaningful time and in a meaningful manner.' " *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 44, quoting *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 47, 512 N.E.2d 626.

{¶ 53} This court has recognized the "due course of law" aspect of Section 16, Article I as the equivalent of the Due Process Clause of the United States Constitution. *Arbino* at ¶ 48.

{¶ 54} The *Holeton* court determined that the former subrogation statute violated Section 19, Article I and that an improper taking had occurred, because the "estimated future values" provision of the statute too often gave the statutory subrogee a windfall. Id., 92 Ohio St.3d at 123, 748 N.E.2d 1111. The *Holeton* court reviewed several scenarios in which the statute required the claimant to reimburse the subrogee for future benefits that would never be received. Id. at 123–124, 748 N.E.2d 1111.

{¶ 55} The *Holeton* court additionally held that the former subrogation statute violated the takings, right-to-a-remedy, and due-process provisions by forcing the claimant to fully reimburse the subrogee in many situations in which the claimant had not been made whole. For instance, the statute required full reimbursement when the claimant settled with a tortfeasor for the limits of an insurance policy and thus was not made whole even when workers' compensation benefits and the settlement amount were combined, and even when the settlement included damages that should not have been reimbursable. Id. at 126, 748 N.E.2d 1111. In reaching this conclusion, the court considered that while the former statute allowed a successful plaintiff to submit jury interrogatories to reduce the subrogee's right to reimbursement, the plaintiff who settled with the tortfeasor was required to fully reimburse the subrogee with no opportunity to show that full reimbursement was unwarranted. Id.

### 1. Subrogation Recovery of Estimated Future Benefits

{¶ 56} As mentioned above, after *Holeton* determined that the former subrogation statute unconstitutionally allowed a statutory subrogee to take a claimant's estimated future benefits, the General Assembly responded by allowing the claimant to establish an interest-bearing trust account. R.C. 4123.931(E)(1). Using this trust account, the claimant reimburses the subrogee periodically for amounts paid upon the claimant's behalf. R.C. 4123.931(E)(3). R.C. 4123.931(E)(1) provides that once the statutory subrogee's duty to pay ends and full reimbursement has occurred, any money remaining in the account shall be "paid to the claimant or the claimant's estate." If the claimant chooses not to establish such an account, the claimant must pay the statutory subrogee "the full

amount of the subrogation interest that represents estimated future payments."
R.C. 4123.931(F).

{¶ 57} Petitioners argue that the current subrogation statutes still authorize an unconstitutional taking because such an account is "unrealistic" (fees and expenses will deplete the principal in most cases), and thus the account's benefits are "illusory." They further argue that a claimant who does not establish a trust account must fully reimburse the subrogee for the estimated future payments, just like under the former statute struck down in *Holeton.*

{¶ 58} We disagree with petitioners' argument. The trust option affords the claimant an opportunity to avoid the consequences of overestimating future benefit values. The claimant who invokes the trust option is no longer required to reimburse the subrogee up front for estimated future payments that may never materialize. Whereas the former statute allowed the subrogee to retain any overpayment, the current trust option ensures the return to the claimant of all funds remaining after the "final reimbursement" of the subrogee. R.C. 4123.931(E)(1).

{¶ 59} This court in *Holeton,* 92 Ohio St.3d at 124, 748 N.E.2d 1111, discussed with approval a Minnesota statute that "does not give the employer or the fund any immediate right of subrogation or reimbursement with regard to future payable compensation or medical benefits. Instead, the Minnesota statute provides a formula under which the employer or fund can obtain reimbursement for compensation paid and then provides that certain remaining tort proceeds *shall be paid to the employee* and constitute a *credit* to the subrogee against future compensation payments." (Emphasis sic.) See Minn.Stat. 176.061(6). Although R.C. 4123.931(E) differs from the Minnesota statute, the Ohio statute implements some of the same features approved by the *Holeton* court.

{¶ 60} Furthermore, the Ohio subrogation statute in *Holeton* required immediate reimbursement to the subrogee of the entire amount of the estimated future benefits, subject to certain exceptions, such as the claimant's attorney fees and expenses. See former R.C. 4123.931(A), (D), and (E), set forth in *Holeton,* 92 Ohio St.3d at 117, 748 N.E.2d 1111. The current statutes contain the same exceptions. See R.C. 4123.93(E). However, the current statutes (as will be discussed in the next part of this opinion) contain a new formula for calculating estimated future benefits that significantly reduces the imbalances condemned in *Holeton.* See R.C. 4123.931(B) and (D).

{¶ 61} We find petitioners' arguments regarding the practical difficulties and supposedly prohibitive costs of a trust account to be too speculative. For one thing, current R.C. 4123.931(E)(2) allows the claimant to use interest from the trust account to pay for expenses. For another, the statute does not require the

claimant to establish a fully managed trust account with a highly compensated trustee.

{¶ 62} Although the General Assembly could have responded differently to the deficiencies identified in *Holeton*, the current statutes governing estimated future benefits are reasonable and do not, on their face, effect an unconstitutional taking.

**2. The Statutory Formula for Allocating the Net Amount Recovered Between the Claimant and the Statutory Subrogee**

{¶ 63} As mentioned above, this court in *Holeton* determined that the subrogation statute in that case violated the takings, right-to-a-remedy, and due-process provisions by failing to adequately correlate the subrogee's reimbursement amount to any amount recovered by the claimant that can be characterized as duplicative or double when the claimant settled with the tortfeasor. The General Assembly responded by enacting a new formula for dividing between the claimant and the subrogee the "net amount recovered" by the claimant from a third party. The formula is the same for claimants who settle with the tortfeasor (see R.C. 4123.931(B)) and for claimants who recover damages after a trial (see R.C. 4123.931(D)).

{¶ 64} Under those statutes, a claimant receives "an amount equal to the uncompensated damages divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered," and the statutory subrogee receives "an amount equal to the subrogation interest divided by the sum of the subrogation interest plus the uncompensated damages, multiplied by the net amount recovered."

{¶ 65} Under R.C. 4123.93(D), the "subrogation interest" includes only "past, present, and estimated future payments of compensation, medical benefits, rehabilitation costs, or death benefits, and any other costs or expenses paid to or on behalf of the claimant by the statutory subrogee." Furthermore, under R.C. 4123.93(E), the "net amount recovered" by the claimant against a third party excludes from the formula "attorney's fees, costs, and other expenses incurred by the claimant in securing" the recovery, as well as punitive damages. Finally, under R.C. 4123.93(F), "uncompensated damages" are the "demonstrated or proven damages minus the statutory subrogee's subrogation interest."

{¶ 66} A hypothetical example taken from the Legislative Service Commission Bill Analysis of 2002 S.B. 227 illustrates how the formula works:

{¶ 67} "The required calculations * * * can be expressed in formulas as follows, where 'NAR' means the 'net amount recovered,' 'UD' means the 'uncompensated damages,' and 'SI' means the 'subrogation interest':

{¶ 68} "• The claimant receives an amount equal to: $UD/(SI + UD) \times NAR$.

{¶ 69} "• The statutory subrogee receives an amount equal to: $SI/(SI + UD) \times NAR$.

{¶ 70} "The following is a hypothetical example of this formula:

{¶ 71} "If the net amount recovered = $70k; the subrogation interest = $60k; and the uncompensated damages = $50k, the claimant would receive $31,818,18. This is calculated as follows: $50k/(60k + 50k) \times 70k$. The statutory subrogee would receive $38,181.82, which is calculated as follows: $60k/(60k + 50k) \times 70k$. The claimant's and statutory subrogee's amounts total $70k, which is the net amount recovered. These formulas apply both to settlements (R.C. 4123.931(B)) and * * * also to cases that proceed to trial (R.C. 4123.931(D))." Id. at 4.

{¶ 72} As a practical matter, the formula divides the "net amount recovered" by the claimant from a third party in such a way that the subrogee receives a proportionate share based on its "subrogation interest" and the claimant receives an amount proportionate to his "uncompensated damages."

{¶ 73} Petitioners argue that under the current statutes, the statutory subrogee may still take a portion of nonduplicative damages, so that the current statutes remain unconstitutional. Petitioners' arguments, however, overlook a key provision of the statutory formula, which we will explain using the same figures as the hypothetical discussed above.

{¶ 74} Because R.C. 4123.93(F) defines "uncompensated damages" as "the claimant's demonstrated or proven damages minus the statutory subrogee's subrogation interest," it necessarily follows that in the hypothetical, the claimant's "demonstrated or proven damages" are $110,000 (a UD of $50,000 plus an SI of $60,000). The formula allows the claimant to retain the subrogation benefits (in the hypothetical, the subrogation benefits are $60,000). In addition to the subrogation benefits, the claimant also receives a portion of the NAR when it is divided in accordance with the formula (in the hypothetical, the claimant's portion of the NAR is $31,818.18). Therefore, in the hypothetical, the claimant receives a total of $91,818.18 toward his $110,000 proven damages.

{¶ 75} From the NAR, the subrogee recovers $38,181.82 of the $60,000 it paid in benefits. Under the former statutory scheme held unconstitutional in *Holeton,* the subrogee might have recovered the full $60,000 even when the claimant was undercompensated. On the other hand, if there were no subrogation at all, the claimant would have received a total of $130,000 (an SI of $60,000 plus an NAR of $70,000), and of course the subrogee would have received nothing. It must also be remembered that under R.C. 4123.93(E), the subrogee does not recoup any portion of the claimant's attorney fees, costs, expenses, or punitive damages, because the formula excludes those amounts from the "net amount recovered."

{¶ 76} From the above, we observe that a key part of the formula's operation is that it allows the claimant to keep the benefits received from the subrogee. Petitioners' arguments fail to account for that very important fact.

{¶ 77} We recognize that under the current statutes, claimants may have to reimburse the subrogee out of recovered damages that are not duplicative and may have to prove that they have not received a double recovery. However, for the reasons that follow, we are convinced that the procedure is facially constitutional and does not constitute an impermissible taking or a violation of due process. Our decision on this point is further supported by the discussion in Part II B below.

{¶ 78} In those situations in which a claimant is not fully compensated, the statutory formula is applied, and the claimant and subrogee share in a pro rata division of the net amount recovered. The claimant and subrogee share the burden of the undercompensation, but that undercompensation is caused by extrinsic factors (e.g., the tortfeasor may be underinsured) beyond the control of either party and not by any of the statutory deficiencies identified in *Holeton*. Although both the claimant and the subrogee obviously would prefer to be made whole, that is not possible when the third party is unable to fully compensate the claimant. Rather than forcing either the claimant or the subrogee to shoulder the full burden of the undercompensation, the General Assembly chose to have them share the burden equally.

{¶ 79} Under the pro rata formula, in some cases, the subrogee will not be able to recover all of the proceeds that are actually duplicative, while in other cases, a claimant may have to yield some proceeds that are not duplicative. Although the *Holeton* court focused on the claimant's perspective, the subrogee's perspective should also be considered. It is not inequitable for the subrogee to obtain some level of reimbursement, and the formula significantly reduces the excessive reimbursement that occurred too often under the previous legislation.

{¶ 80} Again, while the General Assembly could have structured the subrogation statutes in a different way, the formula enacted in R.C. 4123.931(B) and (D) is a reasonable approach that withstands constitutional scrutiny on its face under Sections 16 and 19, Article I. To the extent that this court in *Holeton* was concerned that the prior statute was fundamentally unfair in too many situations, that unfairness has been addressed and the imbalances adjusted to such a degree that the constitutional infirmity has been eliminated.

## B. Equal Protection (Section 2, Article I, Ohio Constitution)

{¶ 81} The third certified question is whether the subrogation statutes violate the Equal Protection Clause, Section 2, Article I of the Ohio Constitution, which

provides, "All political power is inherent in the people. Government is instituted for their equal protection and benefit."

{¶ 82} No fundamental right or suspect class is involved in this case, and therefore, we review the subrogation statutes under the rational-basis test. See *Holeton*, 92 Ohio St.3d at 131, 748 N.E.2d 1111. Under this test, a challenged statute will be upheld if the classifications it creates bear a rational relationship to a legitimate government interest or are grounded on a reasonable justification, even if the classifications are not precise. Id. See, also, *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 49.

{¶ 83} This court in *Holeton* held that the former subrogation statute violated equal protection by distinguishing between claimants who go to trial and claimants who settle. This court reasoned that the former statute "essentially create[d] a presumption that a double recovery occurs whenever a claimant is permitted to retain workers' compensation and tort recovery. Claimants who try their tort claims are permitted to rebut this presumption, while claimants who settle their tort claims are not. Such disparate treatment of claimants who settle their tort claims is irrational and arbitrary because, as demonstrated in [the part of the opinion discussing Sections 16 and 19, Article I], there are situations where claimants' tort recovery is necessarily limited to amounts that if retained along with workers' compensation cannot possibly result in a double recovery." *Holeton*, 92 Ohio St.3d at 132, 748 N.E.2d 1111.

{¶ 84} As we extensively discussed in Part II A above, the General Assembly responded to *Holeton*'s concerns by enacting a formula for dividing the claimant's "net amount recovered" that applies to both classes of claimants. See R.C. 4123.931(B) and (D).

{¶ 85} When a claimant settles with a tortfeasor, current R.C. 4123.931(B) allows the claimant and subrogee several options: they may use the formula to determine the division of the "net amount recovered," agree to divide that amount "on a more fair and reasonable basis," request a conference with the administrator of workers' compensation (see, also, R.C. 4123.931(C)), or resort to an "alternative dispute resolution process."

{¶ 86} When a claimant recovers from a tortfeasor at a trial, R.C. 4123.931(D) specifies that a judge in a nonjury action shall make findings of fact, and the jury in a jury action shall answer interrogatories, that specify the total amount of compensatory damages and then divide that amount into damages representing economic loss and those representing noneconomic loss. Petitioners argue that because the statutory formula for dividing the net amount recovered does not specifically take into account those findings of fact or answers to interrogatories for claimants who recover at trial, the current statutes violate equal protection by

treating claimants who settle differently from claimants who prevail at trial.[2] For the following reasons, we disagree with petitioners' arguments.

{¶ 87} First and foremost, the current statutory formula for dividing the "net amount recovered" applies both to claimants who settle and to claimants who recover at trial. As mentioned above, this new formula has satisfactorily addressed the *Holeton* court's concern that the disparate treatment of these two types of claimants offended Section 16, Article I of the Ohio Constitution. For the same reasons, the formula also rectifies the Section 2, Article I violation identified in *Holeton* stemming from this same disparate treatment.

{¶ 88} We determine that the statutory formula for dividing the net amount recovered itself provides the rational basis required to pass equal-protection scrutiny. In light of the formula, further concerns about a claimant's ability to retain any nonduplicative damages have lost their force. Therefore, even though R.C. 4123.931(B) and 4123.931(D) do not treat the two classes of claimants identically, that differing treatment is not grounded upon an unreasonable justification.

{¶ 89} Furthermore, claimants may have alternatives beyond those specifically recognized in R.C. 4123.931 for demonstrating that a recovered amount is not entirely duplicative, as recognized in decisions of other courts that have considered this issue. For example, in *Fry v. Surf City, Inc.*, 137 Ohio Misc.2d 6, 2006-Ohio-3092, 851 N.E.2d 573, ¶ 24, the court stated that a claimant may bring a separate declaratory judgment action, through which the claimant who settled with a tortfeasor may show that not all of the recovery from the tortfeasor was a double recovery. The court in *Fry* also stated: "In a trial, evidence may be presented and jury interrogatories may be submitted, under Civ.R. 49, to determine what parts of the damages represent[ ] workers' compensation benefits and what parts represent the claimant's unreimbursed interests." Id. at ¶ 25. See, also, *McKinley v. Ohio Bur. of Workers' Comp.*, 170 Ohio App.3d 161, 2006-Ohio-5271, 866 N.E.2d 527, ¶ 26 and 36, which also recognized the possibility of a declaratory judgment action for settling claimants, and of findings of fact (in a

---

2. {¶ a} We specifically note the following discussion of R.C. 4123.931(D) from respondent state of Ohio's brief, which responds to petitioners' equal-protection arguments:

{¶ b} "For a claimant who tries his case, the judge or jury must specify the amount of compensatory damages and the amount of those damages that are economic and non-economic in nature. This is to allow calculation of the 'claimant's demonstrated or proven damages' for purposes of the formula. Having the jury or judge specify the amounts allows the claimant to determine whether the fact-finder was discounting economic or non-economic parts of the award because of an assumed collateral source such as workers' compensation or insurance. If the award was so discounted, the claimant's 'demonstrated or proven damages' can be adjusted accordingly for purposes of the formula. R.C. 4123.931(D)(2). And, contrary to Groch's assertion, R.C. 4123.931(D) does not prevent the claimant or other parties from requesting interrogatories on subjects other than economic and non-economic damages."

nonjury trial) or interrogatories beyond those expressly mentioned in R.C. 4123.931(D) (in a jury trial) to establish the possible duplicative nature of a claimant's award from a third party.

{¶ 90} Because we have already determined that the subrogation statutes do not on their face violate the Equal Protection Clause, there is no need for us to review *Fry* and *McKinley*, and we decline to rely on the availability of declaratory judgment as an additional reason to uphold the statutes. Those considerations are more appropriate in an as-applied challenge and so are beyond the scope of our analysis here, which involves a facial challenge only.

## C. Conclusion of Part II

{¶ 91} The brief of respondent state of Ohio states that the General Assembly, in responding to *Holeton*, enacted the current subrogation statutes as a compromise between business interests and plaintiffs' interests. That brief also states that the General Assembly took into account the negotiations between those factions, along with input from the Bureau of Workers' Compensation and other interested parties, when it drafted the legislation.

{¶ 92} The current subrogation statutes do bear all the earmarks of compromise legislation that attempts to balance the legitimate, competing interests of claimants and statutory subrogees. See *United Auto.*, 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, ¶ 17 ("The manifest objective of the General Assembly in enacting S.B. 227 was to comply with our holding in *Holeton* ").

{¶ 93} Based on the foregoing, we hold that R.C. 4123.93 and 4123.931 do not violate the Takings Clause (Section 19, Article I), the Due Process and Remedies Clauses (Section 16, Article I), or the Equal Protection Clause (Section 2, Article I) of the Ohio Constitution and are therefore facially constitutional.

## III

### Constitutionality of R.C. 2305.10(C) and Former 2305.10(F)

{¶ 94} R.C. 2305.10(C)(1), the products-liability statute of repose, provides:

{¶ 95} "Except as otherwise provided in divisions (C)(2), (3), (4), (5), (6), and (7) of this section or in section 2305.19 of the Revised Code, no cause of action based on a product liability claim shall accrue against the manufacturer or supplier of a product later than ten years from the date that the product was delivered to its first purchaser or first lessee who was not engaged in a business in which the product was used as a component in the production, construction, creation, assembly, or rebuilding of another product."

{¶ 96} R.C. 2305.10(C)(2) through (7) lists six exceptions to the operation of that statute, none of which apply in this case.

{¶ 97} Former R.C. 2305.10(F) (now 2305.10(G)) applies to this case. That statute provided:

{¶ 98} "This section shall be considered to be purely remedial in operation and shall be applied in a remedial manner in any civil action commenced on or after the effective date of this amendment, in which this section is relevant, regardless of when the cause of action accrued and notwithstanding any other section of the Revised Code or prior rule of law of this state, but shall not be construed to apply to any civil action pending prior to the effective date of this amendment."

{¶ 99} A central fact in this case is that the trim press that injured Douglas Groch was "delivered" for R.C. 2305.10(C) purposes to the end user, General Motors, more than ten years prior to his injury. Another central fact is that petitioners filed suit "after the effective date of this amendment" for purposes of former R.C. 2305.10(F). Therefore, if R.C. 2305.10(C) and former 2305.10(F) are constitutional, those statutes prevent petitioners from recovering from Kard Corporation and Racine Federated.

{¶ 100} Petitioners' arguments that R.C. 2305.10 is unconstitutional are largely based on past decisions of this court holding other statutes of repose unconstitutional. That this court has struck down statutes of repose in the past, however, does not necessarily mean that the products-liability statute of repose in this case must meet the same fate. Indeed, in *Arbino*, we upheld as constitutional other tort-reform measures that were, like the provisions of R.C. 2305.10 we review today, contained in S.B. 80, which became effective April 7, 2005.

{¶ 101} In *Arbino*, we provided context for discussion of the constitutional challenges posed in that case by examining the recent history of major tort-reform laws and by summarizing a number of cases in which this court declared unconstitutional former statutes that were "similar in language and purpose to those at issue" in *Arbino*. See 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 10. Parts of that discussion are very pertinent to our analysis today.

{¶ 102} The first key point from *Arbino* is that the legislative branch of government is " 'the ultimate arbiter of public policy,' " and in fulfilling that role, the legislature continually refines Ohio's tort law to meet the needs of our citizens. Id. at ¶ 21, quoting *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21.

{¶ 103} The second key point is that "even considering the numerous opinions by this court on this issue, the basic constitutionality of tort-reform statutes is hardly settled law. Our prior review has focused on certain unconstitutional facets of the prior tort-reform laws that can be addressed to create constitutionally valid legislation. We have not dismissed all tort reform as an unconstitutional concept.

{¶ 104} "While stare decisis applies to the rulings rendered in regard to specific statutes, it is limited to circumstances 'where the facts of a subsequent case are substantially the same as a former case.' *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 5, 539 N.E.2d 103. We will not apply stare decisis to strike down legislation enacted by the General Assembly merely because it is similar to previous enactments that we have deemed unconstitutional. To be covered by the blanket of stare decisis, the legislation must be phrased in language that is substantially the same as that which we have previously invalidated." Id. at ¶ 22–23.

{¶ 105} Because the ultimate conclusion reached in this portion of *Arbino* is of critical importance, and applies with equal force, to the issues we address in this case, we reiterate it here:

{¶ 106} "A careful review of the statutes at issue * * * reveals that they are more than a rehashing of unconstitutional statutes. In its continued pursuit of reform, the General Assembly has made progress in tailoring its legislation to address the constitutional defects identified by the various majorities of this court. The statutes before us * * * are sufficiently different from the previous enactments to avoid the blanket application of stare decisis and to warrant a fresh review of their individual merits." Id. at ¶ 24.

{¶ 107} With the stare decisis doctrine and *Arbino*'s principles in mind, we turn to petitioners' several challenges to the constitutionality of R.C. 2305.10(C) and former 2305.10(F).

## A. Open Courts and Right to a Remedy (Section 16, Article I, Ohio Constitution)

{¶ 108} Section 16, Article I of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." This provision contains two distinct guarantees. First, legislative enactments may restrict individual rights only "by due course of law," a guarantee equivalent to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 199, 551 N.E.2d 938. That aspect of Section 16 will be addressed later in this opinion, in Part III B.

{¶ 109} The second guarantee in Section 16 is that "all courts shall be open to every person with a right to a remedy for injury to his person, property or reputation, with the opportunity for such remedy being granted at a meaningful time and in a meaningful manner." *Sedar*, 49 Ohio St.3d at 193, 551 N.E.2d 938. It is this second guarantee that we address at this point. In considering this aspect of Section 16, it is necessary to discuss our prior decisions in two cases

that are significant here, *Sedar v. Knowlton Constr. Co.* and *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425.

### 1. *Sedar v. Knowlton Constr. Co.*

{¶ 110} In *Sedar,* the plaintiff, Michael Sedar, a Kent State University student, was severely injured when he passed his hand and arm through a panel of wire-reinforced glass in a door in his dormitory in 1985. Construction of the dormitory had been completed in 1966. Sedar sued the architectural engineers who had designed the building and the general contractor who had built it. The trial court granted summary judgment to the defendants based on former R.C. 2305.131, a ten-year statute of repose covering architects and builders, and the court of appeals affirmed, upholding the constitutionality of that statute. *Sedar,* 49 Ohio St.3d at 194, 551 N.E.2d 938.

{¶ 111} This court in *Sedar,* in a thorough and concise opinion, upheld the constitutionality of former R.C. 2305.131 in the face of a challenge based on the open-courts and right-to-a-remedy guarantees of Section 16, Article I, as well as on other grounds. This court stated the overall issue as "whether R.C. 2305.131 may constitutionally prevent the accrual of actions sounding in tort against architects, construction contractors and others who perform services related to the design and construction of improvements to real property, where such action arises more than ten years following the completion of such services." Id. at 194, 551 N.E.2d 938.

{¶ 112} In opening the analysis in *Sedar,* the court explained the key difference between a statute of repose and a statute of limitations. "Unlike a true statute of limitations, which limits the time in which a plaintiff may bring suit *after* the cause of action accrues, a statute of repose * * * potentially bars a plaintiff's suit *before* the cause of action arises." (Emphasis sic.) Id., 49 Ohio St.3d at 195, 551 N.E.2d 938. The court then discussed the history of construction statutes of repose, noting that they were first enacted in the late 1950s and early 1960s as a response to the expansion of common-law liability of architects and builders who historically had not been subject to suit by third parties who lacked privity of contract. Id. Under the privity doctrine, once a contractor's work was completed and accepted by the owner of the property, the responsibility for maintaining the building and protecting third parties from harm shifted to the owner, so that liability was limited to those who were in actual control or possession of the premises. With the demise of the privity doctrine, architects and builders were increasingly subjected to suits brought by third parties long after work on a building had been completed. Id. at 195–196, 551 N.E.2d 938.

{¶ 113} The court in *Sedar* noted that former R.C. 2305.131, by its terms, did not apply to persons in actual possession and control of premises when a third party allegedly was injured, did not apply to suppliers of construction materials,

and did not apply to actions on a contract. Id., 49 Ohio St.3d at 196–197, 551 N.E.2d 938. We then explained the governing standards, applied them to the particulars of the statute, and held that former R.C. 2305.131 did not violate due process. Id. at 199–201, 551 N.E.2d 938.

{¶ 114} Then, in considering the argument that former R.C. 2305.131 violated the open-courts and right-to-a-remedy provisions of Section 16, Article I, the court in *Sedar* first distinguished previous decisions of this court striking down a statute of repose for medical-malpractice actions:

{¶ 115} "[T]he situation presented in the medical malpractice cases, particularly in *Hardy* [*v. VerMeulen* (1987), 32 Ohio St.3d 45, 512 N.E.2d 626], is clearly distinguishable from the situation presented by the operation of R.C. 2305.131. Operation of the medical malpractice repose statute takes away an existing, actionable negligence claim before the injured person discovers it. Thus, 'it denies legal remedy to one who has suffered bodily injury, * * * ' in violation of the right-to-a-remedy guarantee. *Hardy, supra*, at 48, 512 N.E.2d at 629.

{¶ 116} "In contrast, R.C. 2305.131 does not take away an existing cause of action, as applied in this case. ' * * * [I]ts effect, rather, is to prevent what might otherwise be a cause of action, from ever arising. Thus injury occurring more than ten years after the negligent act allegedly responsible for the harm, forms no basis for recovering. The injured party literally has *no* cause of action. * * * ' (Emphasis *sic*.) *Rosenberg v. North Bergen* (1972), 61 N.J. 190, 199, 293 A.2d 662, 667." (Footnote omitted.) *Sedar*, 49 Ohio St.3d at 201–202, 551 N.E.2d 938.

{¶ 117} In *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 49, 512 N.E.2d 626, this court rejected the notion that "causes of action as they existed at common law or the rules that govern such causes are immune from legislative attention." In *Sedar*, we reiterated that position and noted further that " ' "[n]o one has a vested right in rules of the common law. * * * The great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to new circumstances." ' " *Sedar*, 49 Ohio St.3d at 202, 551 N.E.2d 938, quoting *Fassig v. State ex rel. Turner* (1917), 95 Ohio St. 232, 248, 116 N.E. 104.

{¶ 118} We also observed that " ' "[t]his court would encroach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. * * * Such a result would offend our notion of the checks and balances between the various branches of government, and the flexibility required for the healthy growth of the law." ' " *Sedar*, 49 Ohio St.3d at 202, 551 N.E.2d 938, quoting *Klein v. Catalano* (1982), 386 Mass. 701, 712–713, 437 N.E.2d 514, and *Freezer Storage, Inc. v. Armstrong Cork Co.* (1978), 476 Pa. 270, 280–281, 382 A.2d 715.

{¶ 119} *Sedar* ultimately concluded: "The right-to-a-remedy provision of Section 16, Article I applies only to existing, vested rights, and it is state law which determines what injuries are recognized and what remedies are available.  * * * R.C. 2305.131, as applied to bar the claims of appellant here, whose injury occurred over eight years after the expiration of the statute of repose, does not violate Section 16, Article I of the Ohio Constitution." *Sedar*, 49 Ohio St.3d at 202, 551 N.E.2d 938.

{¶ 120} The *Sedar* court then thoroughly analyzed whether former R.C. 2305.131 violated equal-protection principles, noting that "the vast majority of states have upheld similar architect-builder statutes of repose, holding the legislative classifications therein were based on valid distinctions" and finding that authority persuasive.  Id. at 203, 551 N.E.2d 938.  Specifically, the court stated:

{¶ 121} "Owners, tenants and others actually in possession of improvements to real property, who are expressly excluded from operation of the statute, have continuing control of the premises and are responsible for their repair and maintenance.  In contrast, architects and builders have no control over the premises once they are turned over to the owner, after which time" the possibilities of neglect, abuse, poor maintenance, mishandling, improper modification, or unskilled repair of an improvement can arise.  Id., 49 Ohio St.3d at 203–204, 551 N.E.2d 938.

### 2. *Brennaman v. R.M.I. Co.*

{¶ 122} In *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425, this court entertained a constitutional challenge to the same statute, former R.C. 2305.131, that we upheld in *Sedar*.  *Brennaman* involved a defendant, Bechtel Corporation, that had performed engineering and construction services related to the construction of a facility in which sodium was unloaded from railroad cars and piped to storage tanks.  Bechtel's work on the project was completed in 1958.  Id. at 461, 639 N.E.2d 425.

{¶ 123} The injuries at issue in *Brennaman* occurred in 1986 when workers at the plant were replacing a leaking valve in the piping system.  A stream of molten sodium escaped from the system, splashed the workers, and ignited, killing two employees and seriously injuring another.  Id. at 461–462, 639 N.E.2d 425.

{¶ 124} Among the claims raised by the employees and their families were claims against Bechtel for the design and construction of the sodium-handling system.  The trial court granted summary judgment to Bechtel.  Id., 70 Ohio St.3d at 462, 639 N.E.2d 425.  In affirming, the court of appeals primarily followed *Sedar* to hold that the claims against Bechtel were barred by former R.C. 2305.131, because Bechtel's work had been completed more than ten years

prior to the injuries and the statute had recently been upheld as constitutional in *Sedar*. See *Brennaman v. R.M.I. Co.* (Dec. 11, 1992), Ashtabula App. Nos. 92–A–1689 and 92–A–1690, 1992 WL 366982. This court agreed to review that decision.

{¶ 125} In doing so, we first resolved a preliminary issue, determining that the sodium-handling area qualified as "an improvement to real property" so that former R.C. 2305.131 applied to the claims against Bechtel. *Brennaman*, 70 Ohio St.3d at 463–466, 639 N.E.2d 425.

{¶ 126} The court then addressed the plaintiffs' argument that former R.C. 2305.131 was unconstitutional. After acknowledging that *Sedar* had recently upheld the constitutionality of that statute, the court stated, "We revisit our conclusion in *Sedar*." *Brennaman*, 70 Ohio St.3d at 466, 639 N.E.2d 425. In an abbreviated discussion devoid of any in-depth analysis, a majority of this court simply set forth the text of Section 16, Article I; cited one case, *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 61, 609 N.E.2d 140, for the proposition that the General Assembly is constitutionally precluded from depriving a claimant of a right to a remedy before the claimant knew or should have known of the injury; and summarily declared that the statute, because it was a statute of repose, deprived the plaintiffs of the right to sue those who had negligently designed or constructed improvements to real property once ten years had elapsed after the negligent service, and was thus unconstitutional. *Brennaman*, 70 Ohio St.3d at 466, 639 N.E.2d 425.

{¶ 127} The *Brennaman* court then stated that a plaintiff must have a reasonable period of time to see to seek compensation after an accident under Section 16, Article I and that former R.C. 2305.131 conflicted with this right. Id. The court quoted the dissent in *Sedar* to make the point: " 'R.C. 2305.131 effectively closes the courthouse to [Brennaman] and individuals like [her] in contravention of the express language of Section 16, Article I, thereby violating constitutionally protected rights.' " *Brennaman*, 70 Ohio St.3d at 466, 639 N.E.2d 425, quoting *Sedar*, 49 Ohio St.3d at 205, 551 N.E.2d 938 (Douglas, J., dissenting).

{¶ 128} The court completed its discussion of the issue by stating:

{¶ 129} "Today we reopen the courthouse doors by declaring that R.C. 2305.131, a statute of repose, violates the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution, and is, thus, unconstitutional. We overrule *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938." *Brennaman*, 70 Ohio St.3d at 466–467, 639 N.E.2d 425. See, also, paragraph two of the syllabus. The court concluded in *Brennaman* that the plaintiffs had filed their complaints within one year after their causes of action arose and that this had been within a reasonable time, and reversed the judgment

of the court of appeals and remanded the cause for trial. Id. at 466–467, 639 N.E.2d 425.

{¶ 130} The preceding summary of *Brennaman* is essentially the court's full opinion regarding the unconstitutionality of former R.C. 2305.131. *Brennaman's* entire discussion of this issue, which culminated in the holding that the statute violated Section 16, Article I and which overruled *Sedar,* spans one page of the Ohio Official Reports. The analytical portion of the court's opinion is a mere four paragraphs long.

### 3. Application of *Sedar* and *Brennaman*

{¶ 131} Petitioners' principal argument that R.C. 2305.10(C) and former 2305.10(F) are unconstitutional on open-courts and right-to-a-remedy grounds is based on *Brennaman.* Their argument relies in large part on *Brennaman's* broad implication that all statutes of repose violate Section 16, Article I and on the stare decisis value of that decision.

{¶ 132} Respondents Kard Corporation and Racine Federated assert that *Sedar* properly analyzed and upheld the constitutionality of the statute of repose at issue in that case and propose that "[t]o the extent this court finds *Brennaman* and *Sedar* in irreconcilable conflict, *Brennaman* should be overruled consistent with the required presumptions of constitutionality and the holdings of a clear majority of sister state courts." Kard Corporation and Racine Federated further contend that the factors set forth in *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 48, lead to the conclusion that *Brennaman* should be overruled.

{¶ 133} In *Galatis,* we explained when the principle of stare decisis must yield: "The doctrine of stare decisis is designed to provide continuity and predictability in our legal system. We adhere to stare decisis as a means of thwarting the arbitrary administration of justice as well as providing a clear rule of law by which the citizenry can organize their affairs. * * * However, a supreme court not only has the right, but is entrusted with the duty to examine its former decisions and, when reconciliation is impossible, to discard its former errors." Id. at ¶ 43.

{¶ 134} Given the importance of the doctrine of stare decisis, we set forth in *Galatis* a tripartite test for considering whether a previous decision of this court should be overruled: "A prior decision of the Supreme Court may be overruled where (1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it." Id. at paragraph one of the syllabus.

{¶ 135} The explicit purpose of the *Galatis* test, which was developed after *Brennaman* was decided, is to provide a "well-structured method of ensuring a disciplined approach to deciding whether to abandon a precedent." Id., 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶ 47. *Brennaman* illustrates the pitfalls of a court's application of an unstructured approach to overruling a precedent.

{¶ 136} Although *Sedar* was a thorough and concise opinion that fully sustained each of its specific conclusions with extensive reasoning, *Brennaman* is the classic example of the "arbitrary administration of justice" that *Galatis* cautions against.

{¶ 137} *Brennaman* cavalierly overruled *Sedar* with virtually no analysis. In the process, *Brennaman* failed to accord proper respect to the principle of stare decisis. See 70 Ohio St.3d at 468, 639 N.E.2d 425 (Moyer, C.J., concurring in part and dissenting in part) ("A mere four years ago this court affirmed the constitutionality of R.C. 2305.131 in *Sedar* * * *. However, * * * the majority ignores the doctrine of *stare decisis* and the policy of consistency underlying it, to strike down a valid exercise of the General Assembly's power"). *Brennaman* illustrates why it is imperative that the *Galatis* factors be applied. Otherwise, the principles of predictability and stability are sacrificed for the sake of personal judicial whims.

{¶ 138} The problem with *Brennaman* is not that it overruled *Sedar*, but rather, the way in which it did so. *Sedar* presented a measured and reasoned analysis of why the particular statute of repose at issue in that case differed from some other statutes of repose, demonstrating that the constitutionality of any specific statute of repose should turn on the particular features of the statute at issue, and that such a statute should be evaluated narrowly within its specific context. In contrast, *Brennaman* gave scant justification to support any of the court's reasoning. *Brennaman*'s imprecise analysis not only overruled *Sedar*, but also led to a sweeping repudiation by implication of not just the specific statute of repose before it, but of all statutes of repose in general, including presumably those enacted after *Brennaman* was decided.

{¶ 139} This case involves a different statute of repose than was at issue in *Sedar* and *Brennaman* and thus stands in its own light before this court. The constitutionality of the statutes at issue here certainly is not governed by the broad but hollow *Brennaman* analysis. Indeed, *Brennaman*'s lack of any meaningful analysis makes it impossible for us to consider even the first *Galatis* factor (whether a previous decision was wrongly decided) in evaluating *Brennaman*'s treatment of *Sedar*. Instead of a targeted approach that systematically explained the flaws in *Sedar*, *Brennaman* reached its conclusion without deigning to explain why *Sedar* was wrongly decided, other than to employ a short quote from the *Sedar* dissent.

{¶ 140} The deficiencies underlying *Brennaman*'s overruling of *Sedar* are clear.

{¶ 141} Any constitutional analysis must begin with the presumption of constitutionality enjoyed by all legislation, and the understanding that it is not this court's duty to assess the wisdom of a particular statute. See *Brennaman,* 70 Ohio St.3d at 468, 639 N.E.2d 425 (Moyer, C.J., concurring in part and dissenting in part). *Brennaman* did not even mention in passing the presumption of constitutionality, and it accorded no deference to the General Assembly's determination of public policy as expressed in the statute under review.

{¶ 142} In addition, *Brennaman* did not consider the critical distinction between statutes of repose and statutes of limitations. The *Brennaman* dissent, on the other hand, explained why the distinction is critical: " 'Unlike a true statute of limitations, which limits the time in which a plaintiff may bring suit *after* the cause of action accrues, a statute of repose * * * potentially bars a plaintiff's suit *before* the cause of action arises.' (Emphasis *sic.*) *Sedar, supra,* 49 Ohio St.3d at 195, 551 N.E.2d at 941. A statute of repose does not deny a remedy for a vested cause of action but, rather, bars the action before it ever arises. Id. at 201, 551 N.E.2d at 946. Therefore, no right of action ever accrued to appellants in which their constitutional rights to damages or jury determination arose." *Brennaman,* 70 Ohio St.3d at 468, 639 N.E.2d 425 (Moyer, C.J., concurring in part and dissenting in part). The *Brennaman* court made no attempt to explain why *Sedar*'s conclusion on the very important point emphasized in the *Brennaman* dissent was wrongly determined. Rather, the *Brennaman* court sidestepped this question entirely.

{¶ 143} As the dissent in *Brennaman* also observed, the statute at issue in that case did not necessarily deprive a plaintiff of a right to a remedy, because injured parties potentially had recourse through other avenues, such as through workers' compensation (if the plaintiff was an employee), an intentional-tort suit against an employer, or possibly under a premises-liability theory (if the plaintiff was not an employee). Id. The majority in *Brennaman* did not explain why the plaintiffs' right to a remedy was violated even though additional avenues of recovery were potentially available to them.

{¶ 144} Moreover, as the dissent in *Brennaman* noted, at common law, the actions of the plaintiffs in that case would have been barred by the privity doctrine. The statute of repose at issue struck a rational balance between the rights of injured parties and the rights of architects and engineers and guarded against the risk of stale litigation. Id., 70 Ohio St.3d at 469, 639 N.E.2d 425 (Moyer, C.J., concurring in part and dissenting in part). The majority in *Brennaman* did not address these concerns.

{¶ 145} The majority's decision in *Brennaman* also ignored the predicament of builders, who have no legal right to enter an owner's property to correct a defect that is discovered after the builder's work is completed and turned over to the owner, but who may be subject to suit even though they had no ability to correct a problem that arose subsequent to their work and without their knowledge. Id. (Moyer, C.J., concurring in part and dissenting in part). The *Brennaman* majority failed to address the concern that a builder who is subject to suit has no ability to correct a problem that arises later.

{¶ 146} Given all of the deficiencies in *Brennaman,* and the context in which it arose, *Brennaman* cannot control here. Because *Brennaman* did not involve a challenge to a products-liability statute of repose, as the instant case does, that decision is not directly on point and can arguably apply only because of its overexpansive language. We confine *Brennaman* to its particular holding that former R.C. 2305.131, the prior statute of repose for improvements to real property, was unconstitutional. It is entitled to nothing more. To the extent that *Brennaman* stands for the proposition that all statutes of repose are repugnant to Section 16, Article I, we expressly reject that conclusion.

{¶ 147} In so doing, we find that the fundamental weaknesses of *Brennaman* limit its value. For that reason, we do not overrule *Brennaman*; we simply decline to follow its unreasoned rule in contexts in which it is not directly controlling. We find that the statutes at issue in this case "are sufficiently different from the previous enactments to avoid the blanket application of stare decisis and to warrant a fresh review of their individual merits." See *Arbino,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 24. We therefore decline respondents' invitation to overrule *Brennaman.*

{¶ 148} We find that the interpretation of the open-courts and right-to-a-remedy provisions by this court in *Sedar* is more fully developed and appropriate than that set forth in *Brennaman.* We specifically adopt *Sedar*'s rationale here, finding that its holding is based on proper construction of the requirements of Section 16, Article I.

{¶ 149} Although R.C. 2305.10(C) is different from the statute of repose at issue in *Sedar* and *Brennaman,* it is similar in a key respect. As with the statute of repose at issue in those cases, R.C. 2305.10(C) operates to potentially bar a plaintiff's suit before a cause of action arises. Thus, the statute can prevent claims from ever vesting if the product that allegedly caused an injury was delivered to an end user more than ten years before the injury occurred. This feature of the statute triggers the portion of *Sedar*'s fundamental analysis concerning Section 16, Article I that is dispositive of our inquiry here. Because such an injured party's cause of action never accrues against the manufacturer or supplier of the product, it never becomes a vested right.

{¶ 150} As this court stated in *Sedar*, 49 Ohio St.3d at 202, 551 N.E.2d 938: "The right-to-a-remedy provision of Section 16, Article I applies only to existing, vested rights, and it is state law which determines what injuries are recognized and what remedies are available." Here, the General Assembly has established through the enactment of R.C. 2305.10(C) the injuries that are recognized and the remedies that are available. As in *Sedar*, the statute at issue here does not violate Section 16, Article I of the Ohio Constitution.

{¶ 151} We emphasize a distinct practical concern that was discussed by the *Sedar* court when it held the statute in that case constitutional. A plaintiff's right to a remedy is not necessarily extinguished when a particular statute of repose might apply to foreclose suits by that plaintiff against certain defendants. In *Sedar*, the construction statute of repose at issue expressly did not cover those in control of the property such as owners and tenants, so that an owner or tenant could be held liable for using the premises for a purpose it was not designed for, or for making defective alterations. Id., 49 Ohio St.3d at 203–204, 551 N.E.2d 938. See, also, *Brennaman*, 70 Ohio St.3d at 468, 639 N.E.2d 425 (Moyer, C.J., concurring in part and dissenting in part) (former R.C. 2305.131 did not violate Section 16, Article I because plaintiffs had recourse through other avenues of redress).

{¶ 152} Although R.C. 2305.10(C) may prevent some suits against product manufacturers, in many situations, an injured party may be able to seek recovery against other parties. For example, if an employer modifies a machine after it is acquired, the employer could be liable for the consequences of a negligent alteration. As will be discussed in Part III B below, the General Assembly specifically recognized in Sections 3(C)(3) and (4) of S.B. 80 that after a product is delivered, a manufacturer or supplier lacks control over the product, over its uses, and over the conditions of its use and concluded that it is more appropriate for the party that controls the product to be responsible for any harm caused.

{¶ 153} Petitioners also cite three cases from 1986 and 1987 in which this court struck down different aspects of a medical-malpractice statute of repose on various grounds and as applied to various factual circumstances—*Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717; *Hardy*, supra, 32 Ohio St.3d 45, 512 N.E.2d 626; and *Gaines*, supra, 33 Ohio St.3d 54, 514 N.E.2d 709. However, as explained in *Sedar*, 49 Ohio St.3d at 202, 551 N.E.2d 938, those cases are distinguishable because the medical-malpractice statute of repose interpreted in them took away an existing, actionable negligence claim before the injured person discovered the injury (when the injury had already occurred) or gave the injured person too little time to file suit, and therefore denied the injured party's right to a remedy for those reasons. The three

medical-malpractice cases petitioners rely on therefore do not support a contrary result here.

{¶ 154} For all the foregoing reasons, we hold that R.C. 2305.10(C) and former 2305.10(F) do not on their face violate the open-courts and right-to-a-remedy guarantees of Section 16, Article I.

### B. Due Process and Equal Protection (Section 16, Article I and Section 2, Article I, Ohio Constitution)

{¶ 155} Petitioners assert that R.C. 2305.10(C) and former 2305.10(F) violate the "due course of law" guarantee of Section 16, Article I. Petitioners urge this court to apply strict scrutiny in evaluating the statutes because they restrict fundamental rights. Under such an analysis, a statute restricting fundamental rights "will be considered unconstitutional unless it is shown to be necessary to promote a compelling governmental interest." *Sorrell v. Thevenir*, 69 Ohio St.3d at 423, 633 N.E.2d 504.

{¶ 156} As we did in *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 49, however, we reject a strict-scrutiny approach to the due-process challenge raised in this case. R.C. 2305.10(C) and former 2305.10(F) do not impinge upon fundamental rights. See Part III A, above.

{¶ 157} We will instead employ a rational-basis review, under which the statute will be upheld if it is rationally related to a legitimate government purpose and is not unreasonable or arbitrary. *Mominee*, 28 Ohio St.3d at 274, 28 OBR 346, 503 N.E.2d 717. In conducting this review, we must consider whether the General Assembly's purposes in enacting the legislation at issue provide adequate support to justify the statute's effects.

{¶ 158} Petitioners also assert that R.C. 2305.10(C) and former 2305.10(F) violate the "equal protection and benefit" provision of Section 2, Article I of the Ohio Constitution. Petitioners propose that "R.C. 2305.10 arbitrarily and capriciously differentiates between plaintiffs injured by a defective product ten years or more after it was sold to an end-user, and plaintiffs sustaining comparable injuries less than ten years after the sale to an end-user."

{¶ 159} We apply a rational-basis review here also, for the statutes involve neither a fundamental right nor a suspect class.

{¶ 160} Because the due-process and equal-protection challenges both require us to review legislative purpose, we will address that issue first.

{¶ 161} In Section 3 of S.B. 80, the General Assembly made a "statement of findings and intent" explaining certain provisions of the bill. We will concentrate here on those findings relating to the products-liability statute of repose.

{¶ 162} Section 3(C) of S.B. 80 states:

{¶ 163} "In enacting division (D)(2) of section 2125.02 and division (C) of section 2305.10 of the Revised Code in this act, it is the intent of the General Assembly to do all of the following:

{¶ 164} "(1) To declare that the ten-year statute of repose prescribed by division (D)(2) of section 2125.02 and division (C) of section 2305.10 of the Revised Code, as enacted by this act, are specific provisions intended to promote a greater interest than the interest underlying the general four-year statute of limitations prescribed by section 2305.09 of the Revised Code, the general two-year statutes of limitations prescribed by sections 2125.02 and 2305.10 of the Revised Code, and other general statutes of limitations prescribed by the Revised Code;

{¶ 165} "(2) To declare that, subject to the two-year exceptions prescribed in division (D)(2)(d) of section 2125.02 and in division (C)(4) of section 2305.10 of the Revised Code, the ten-year statutes of repose shall serve as a limitation upon the commencement of a civil action in accordance with an otherwise applicable statute of limitations prescribed by the Revised Code;

{¶ 166} "(3) To recognize that subsequent to the delivery of a product, the manufacturer or supplier lacks control over the product, over the uses made of the product, and over the conditions under which the product is used;

{¶ 167} "(4) To recognize that under the circumstances described in division (C)(3) of this section, it is more appropriate for the party or parties who have had control over the product during the intervening time period to be responsible for any harm caused by the product;

{¶ 168} "(5) To recognize that, more than ten years after a product has been delivered, it is very difficult for a manufacturer or supplier to locate reliable evidence and witnesses regarding the design, production, or marketing of the product, thus severely disadvantaging manufacturers or suppliers in their efforts to defend actions based on a product liability claim;

{¶ 169} "(6) To recognize the inappropriateness of applying current legal and technological standards to products manufactured many years prior to the commencement of an action based on a product liability claim;

{¶ 170} "(7) To recognize that a statute of repose for product liability claims would enhance the competitiveness of Ohio manufacturers by reducing their exposure to disruptive and protracted liability with respect to products long out of their control, by increasing finality in commercial transactions, and by allowing manufacturers to conduct their affairs with increased certainty;

{¶ 171} "(8) To declare that division (D)(2) of section 2125.02 and division (C) of section 2305.10 of the Revised Code, as enacted by this act, strike a rational balance between the rights of prospective claimants and the rights of product manufacturers and suppliers and to declare that the ten-year statutes of repose

prescribed in those sections are rational periods of repose intended to preclude the problems of stale litigation but not to affect civil actions against those in actual control and possession of a product at the time that the product causes an injury to real or personal property, bodily injury, or wrongful death."

{¶ 172} For purposes of both due process and equal protection, we determine that the above findings adequately demonstrate that the statutes bear a real and substantial relation to the public health, safety, morals, or general welfare of the public and are not unreasonable or arbitrary. "[A]n intensive reexamination" of the General Assembly's findings "is beyond the scope of our review. * * * [W]e noted in *State v. Williams* (2000), 88 Ohio St.3d 513, 531, 728 N.E.2d 342, that 'we are to grant substantial deference to the predictive judgment of the General Assembly' under a rational-basis review. Further, as the United States Supreme Court has stated, 'it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature.' *Minnesota v. Clover Leaf Creamery Co.* (1981), 449 U.S. 456, 470, 101 S.Ct. 715, 66 L.Ed.2d 659." *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 58.

{¶ 173} In *Sedar*, 49 Ohio St.3d at 199–201, 551 N.E.2d 938, this court upheld former R.C. 2305.131, a ten-year statute of repose, in the face of a due-process challenge, finding that legislative objectives similar to those enumerated in Section 3(C) of S.B. 80 were sufficient to satisfy due-process concerns. The same conclusion applied to the equal-protection challenge. Id. at 202–205, 551 N.E.2d 938. For the reasons set forth in *Sedar*, we uphold the statutes challenged in this case as not unreasonable or arbitrary. Although some of the legislative findings may be open to debate, we will not second-guess their validity.

{¶ 174} Petitioners' equal-protection argument further charges that the legislature has acted irrationally in choosing a ten-year period of repose. Although the *Sedar* court discussed the reasonableness of a ten-year period only in its due-process discussion, that analysis is equally relevant to equal protection. The *Sedar* court, 49 Ohio St.3d at 200, 551 N.E.2d 938, concluded that "[t]he legislature's choice of ten years to achieve its valid goal of limiting liability here was neither unreasonable nor arbitrary. * * * Indeed, a substantial majority of states have found no due process violations in similar statutes, some of which afford periods as brief as four years." (Footnote omitted.)

{¶ 175} In light of the above, we determine that R.C. 2305.10(C) and former 2305.10(F) do not violate principles of due process or equal protection and are constitutional on their face.

### C. The Takings Clause (Section 19, Article I, Ohio Constitution)

{¶ 176} Basing their argument in large part on the discussion of the Takings Clause in *Holeton*, supra, 92 Ohio St.3d at 121–130, 748 N.E.2d 1111, which we

reviewed extensively in Part II of this opinion, petitioners argue that R.C. 2305.10(C) and former 2305.10(F) constitute an improper taking under Section 19, Article I of the Ohio Constitution. Petitioners propose that a person who has sustained bodily injury through the fault of another has a property interest in a claim for relief and that R.C. 2305.10 materially interferes with that property interest, so that a taking occurs when an injured party is "divested of his cause of action."

{¶ 177} We reject this argument. *Holeton* is readily distinguishable. An existing, identifiable property interest was at stake in that case—a claimant's tort recovery from a third party through a trial or through a settlement. In contrast, as discussed in Part III A above, the statute of repose at issue in this case involves a cause of action that never accrues and thus is prevented from vesting once the ten-year repose period has passed. Because there is no property right, there can be no taking. Consequently, we determine that R.C. 2305.10(C) and former 2305.10(F) are constitutional on their face under Section 19, Article I.

### D. The Retroactivity Clause (Section 28, Article II, Ohio Constitution)

{¶ 178} Section 28, Article II of the Ohio Constitution provides, "The general assembly shall have no power to pass retroactive laws."

{¶ 179} Petitioners assert that former R.C. 2305.10(F) is unconstitutional as applied to them because it retroactively extinguishes a substantive right in violation of Section 28, Article II. Petitioner Douglas Groch was injured on March 3, 2005. The effective date of the S.B. 80 amendments to R.C. 2305.10 was April 7, 2005, after the injury. Pursuant to former R.C. 2305.10(F), R.C. 2305.10(C) applies to all actions "commenced on or after" April 7, 2005. For their suit to be timely, and to avoid the bar of R.C. 2305.10(C), petitioners had to commence their suit prior to April 7, 2005. Petitioners filed their complaint after that date. Therefore, if former R.C. 2305.10(F) and current 2305.10(C) are valid, they combine to prevent petitioners from recovering on their accrued cause of action.

{¶ 180} Petitioners' argument, because it is based on the specific facts of this case, is an "as applied" challenge to the constitutionality of R.C. 2305.10, rather than a facial challenge. Therefore, the standard here is different from the standard governing the other certified questions presented by this case.

{¶ 181} "[W]here statutes are challenged on the ground that they are unconstitutional as applied to a particular set of facts, the party making the challenge bears the burden of presenting clear and convincing evidence of a presently existing set of facts that make the statutes unconstitutional and void when applied to those facts." *Harrold v. Collier*, supra, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 38, citing *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph six of the syllabus.

{¶ 182} The first question that must be answered under Section 28, Article II is whether the General Assembly intended its enactment to apply retrospectively. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 106, 522 N.E.2d 489, and at paragraph one of the syllabus. See, also, *State v. Cook* (1998), 83 Ohio St.3d 404, 410, 700 N.E.2d 570.

{¶ 183} The General Assembly has expressed the clear intent in former R.C. 2305.10(F) that current 2305.10 is meant to apply retrospectively to plaintiffs in petitioners' position. Therefore we must proceed to the second question, which is whether the statute violates Section 28, Article II as applied to petitioners.

{¶ 184} In *State v. Cook*, 83 Ohio St.3d at 410–411, 700 N.E.2d 570, we described this inquiry:

{¶ 185} " ' "Every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective or retroactive." ' *Van Fossen*, 36 Ohio St.3d at 106, 522 N.E.2d at 496, quoting *Cincinnati v. Seasongood* (1889), 46 Ohio St. 296, 303, 21 N.E. 630, 633.

{¶ 186} "In order to determine whether [a statute] is unconstitutionally retroactive under *Van Fossen*, we must determine whether [the statute] is substantive or merely remedial. See *Van Fossen*, 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph three of the syllabus. A statute is 'substantive' if it impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligation[s], or liabilities as to a past transaction, or creates a new right. Id. at 107, 522 N.E.2d at 496. Conversely, remedial laws are those affecting only the remedy provided, and include laws that merely substitute a new or more appropriate remedy for the enforcement of an existing right. Id. at 107, 522 N.E.2d at 497. A purely remedial statute does not violate Section 28, Article II of the Ohio Constitution, even if applied retroactively. See *id.* at 107, 522 N.E.2d at 496."

{¶ 187} The General Assembly expressly states its intent in former R.C. 2305.10(F) that "this section shall be considered to be purely remedial in operation." However, whether the statute is remedial depends upon its operation and not upon a label placed upon it by the General Assembly. Furthermore, the statute may be remedial in some contexts but not in all.

{¶ 188} As discussed above, R.C. 2305.10(C) prevents a cause of action from accruing if the product that caused an injury was delivered to an end user more than ten years before the injury occurred. Because the injured party's cause of action never accrues, it never becomes a vested right. For that reason, for most plaintiffs, there is no "substantive right" affected by R.C. 2305.10(C), and that statute on its face does not violate Section 28, Article II.

{¶ 189} Petitioners' situation, however, is different. Pursuant to former R.C. 2305.10(F) (now (G)), R.C. 2305.10(C) does not apply "to any civil action pending prior to the effective date of this amendment [April 7, 2005]." Thus, a cause of action based on an injury that occurred prior to April 7, 2005, does "accrue," and petitioners' cause of action did vest for purposes of Section 28, Article II. For plaintiffs in petitioners' situation, former R.C. 2305.10(F) operates as a true statute of limitations that restricts the time for filing a cause of action that has validly accrued. See *Sedar*, 49 Ohio St.3d at 195, 551 N.E.2d 938. As with any statute of limitations, R.C. 2305.10(F) prevents a plaintiff from recovering on a cause of action if the limitations period expires and if the defendant interposes the statute of limitations as a defense.

{¶ 190} Douglas Groch's injury occurred on March 3, 2005. By operation of former R.C. 2305.10(F), petitioners had only 34 days to commence their suit before the effective date of R.C. 2305.10(C) and former 2305.10(F) (April 7, 2005), or their cause of action was barred by R.C. 2305.10(C)(1). Petitioners did not commence their suit until June 2, 2006.

{¶ 191} Respondents Kard Corporation and Racine Federated argue that petitioners do not have a vested right that is being impaired by R.C. 2305.10(C) for purposes of retroactivity analysis. However, respondents cannot have it both ways. If, as we have said, the principal grounds for upholding R.C. 2305.10(C) is that it prevents a products-liability cause of action from accruing once ten years have passed since the product's delivery to an end user, it cannot also bar a cause of action that accrued—and therefore vested—*prior* to the statute's effective date. Once vested, such a cause of action clearly becomes a substantive right for purposes of Section 28, Article II. See *Van Fossen*, 36 Ohio St.3d at 107, 522 N.E.2d 489.

{¶ 192} Respondents Kard Corporation and Racine Federated additionally assert that even if petitioners' cause of action vested when Douglas Groch was injured, former R.C. 2305.10(F) provided "a reasonable window of time" for filing suit. But we cannot agree that 34 days is "reasonable."

{¶ 193} To determine what is a reasonable time, we note that R.C. 2305.10(C)(4) provides a two-year limitations period for commencing a suit for injuries occurring before the expiration of the ten-year repose period of R.C. 2305.10(C)(1), "but less than two years prior to the expiration of that period." For example, under R.C. 2305.10(C)(4), if the product was delivered to the end user nine years prior to the injury, the injured plaintiff would still have two years in which to file suit.

{¶ 194} Similarly, R.C. 2305.10(C)(5) provides that "[i]f a cause of action relative to a product liability claim accrues during the ten-year period described in division (C)(1) of this section and the claimant cannot commence an action

during that period due to a disability described in section 2305.16 of the Revised Code [i.e., minority or unsound mind], an action based on the product liability claim may be commenced within two years after the disability is removed."

{¶ 195} Both R.C. 2305.10(C)(4) and (C)(5) recognize that once a products-liability cause of action accrues, a plaintiff should have no fewer than two years in which to commence a suit. This recognition is consistent with R.C. 2305.10(A), the general products-liability statute of limitations, which states that, subject to certain exceptions (including those in R.C. 2305.10(C)), such a claim "shall be brought within two years after the cause of action accrues."

{¶ 196} In *Gaines*, 33 Ohio St.3d at 60, 514 N.E.2d 709, this court stated: "[A] legislative enactment may lawfully shorten the period of time in which the remedy may be realized 'as long as the claimant is still afforded a reasonable time in which to enforce his right.' *Adams v. Sherk* (1983), 4 Ohio St.3d 37, 39, 4 OBR 82, 84, 446 N.E.2d 165, 167. A 'reasonable time' in which to bring a medical malpractice claim was defined in *Adams* as 'one year after the discovery of the malpractice.' Id. at 40, 4 OBR at 85, 446 N.E.2d at 168. In the instant cause, appellant had approximately six and one-half months in which to pursue her claim * * *. * * * Thus, [the statute at issue] cannot lawfully be applied to appellant and others similarly situated, since it affords them less than a reasonable time in which to bring a claim, *Adams, supra* * * *."

{¶ 197} This court determined that one year is a reasonable time to bring a medical-malpractice action because the general medical-malpractice statute of limitations provides one year. See R.C. 2305.113(A), formerly 2305.11(A). See *Adams*, 4 Ohio St.3d at 38–39, 4 OBR 82, 446 N.E.2d 165. See, also, *Baird v. Loeffler* (1982), 69 Ohio St.2d 533, 535–536, 23 O.O.3d 458, 433 N.E.2d 194 ("the statute of limitations for medical malpractice actions * * * provided appellee a reasonable time of one year in which to bring his suit"), overruled on other grounds in *Mominee*, 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717, at the syllabus.

{¶ 198} We hold that former R.C. 2305.10(F) operates unreasonably as applied to petitioners because it provided them with only 34 days to commence their suit, with the consequence that they lost their cause of action if they did not file suit within 34 days. When we look to the other provisions of R.C. 2305.10 referred to above, we determine that a reasonable time to commence a suit in this situation should have been two years from the date of the injury. See *Adams*, 4 Ohio St.3d at 38, 4 OBR 82, 446 N.E.2d 165. Under this approach, because petitioners filed their suit within two years of the date of the injury, their suit was timely. To the extent that former R.C. 2305.10(F) mandates a different result, we hold that petitioners have met their burden of demonstrating that the statute as applied to them is unconstitutional under Section 28, Article II.

{¶ 199} In light of the foregoing, we hold that to the extent that former R.C. 2305.10(F) (now (G)) affects an accrued substantive right by providing an unreasonably short period of time in which to file suit for certain plaintiffs whose injuries occurred before the S.B. 80 amendments to R.C. 2305.10 became effective, and whose causes of action therefore accrued for purposes of R.C. 2305.10(C), former R.C. 2305.10(F) is unconstitutionally retroactive under Section 28, Article II of the Ohio Constitution.

### E. The One–Subject Rule (Section 15(D), Article II, Ohio Constitution)

{¶ 200} Petitioners assert that S.B. 80, which enacted the provisions of R.C. 2305.10(C) and former 2305.10(F) at issue in this case, violates the one-subject rule of Section 15(D), Article II of the Ohio Constitution. Section 15(D), Article II provides: "No bill shall contain more than one subject, which shall be clearly expressed in its title."

{¶ 201} The petitioners in *Arbino* also attempted to assert a challenge to S.B. 80 based on the one-subject rule. In *Arbino*, we stated:

{¶ 202} Section 15(D) "exists to prevent the General Assembly from engaging in 'logrolling.' *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 142, 11 OBR 436, 464 N.E.2d 153. This practice occurs when legislators combine a disharmonious group of proposals in a single bill so that they may consolidate votes and pass provisions that may not have been acceptable to a majority on their own merits. See id. at 142–143, 11 OBR 436, 464 N.E.2d 153. 'The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.*, those dealing with more than one subject, on the theory that the best explanation for the unnatural combination is a tactical one—logrolling.' Id. at 143, 11 OBR 436, 464 N.E.2d 153. Arbino argues that S.B. 80 violates this provision by combining a variety of vastly different subjects under one title, lumping such subjects as Board of Cosmetology membership (R.C. 4713.02) and practice protocols for retired dentists (R.C. 4715.42) with the tort reforms discussed herein.

{¶ 203} "However, unlike in [*State ex rel. Ohio Academy of Trial Lawyers v.*] *Sheward* [ (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062], where we were asked to examine H.B. 350 in its entirety, the review here is limited to three specific statutes within S.B. 80. Because the entire enactment was not made an issue in this case, we cannot determine whether it violates the single-subject rule as a whole, and therefore decline to rule on this issue." *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 78–79.

{¶ 204} Petitioners' challenge is limited to two specific statutes within S.B. 80— R.C. 2305.10(C) and former 2305.10(F). Therefore, *Arbino* applies. However, we now go further and explain in more detail why petitioners' challenge must fail.

{¶ 205} Many of petitioners' principal arguments regarding the one-subject rule are based on this court's decision in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062. In *Sheward*, at paragraph three of the syllabus, this court held that "Am.Sub.H.B. No. 350 violates the one-subject provision of Section 15(D), Article II of the Ohio Constitution, and is unconstitutional *in toto*."[3]

{¶ 206} In *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 17, we discussed Am.Sub.H.B. No. 350, the legislation struck down in *Sheward*, as part of our review of the recent history of tort-reform efforts in Ohio:

{¶ 207} "[T]he General Assembly passed substantial reforms in 1997 with Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867 ('H.B. 350'). The legislation amended, enacted, or repealed over 100 sections of the Revised Code contained in 18 titles and 38 chapters. Among other things, it modified the collateral-source rule in tort actions to require the trier of fact to consider but not automatically set off collateral benefits (former R.C. 2317.45), capped punitive damages and allowed the trier of fact to determine damages up to the cap in tort and products-liability claims (former R.C. 2315.21(D)(1)), and capped noneconomic damages at different levels, with higher limits for permanent injuries (former R.C. 2323.54)."

{¶ 208} In holding H.B. 350 unconstitutional for violating the one-subject rule, this court in *Sheward* focused on the sheer disunity of its many and diverse subjects to find a "manifestly gross and fraudulent violation" of Section 15(D), Article II. Id., 86 Ohio St.3d at 498, 715 N.E.2d 1062; see *Dix*, 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, at the syllabus (a manifestly gross and fraudulent violation of the one-subject rule will cause an enactment to be invalidated). In addition to the provisions of H.B. 350 cited in *Arbino*, the *Sheward* court noted that H.B. 350 "attempts to combine the wearing of seat belts with employment discrimination claims, class actions arising from the sale of securities with limitations on agency liability in actions against a hospital, recall notification with qualified immunity for athletic coaches, actions by a roller skater with supporting affidavits in a medical claim, and so on." Id., 86 Ohio St.3d at 498, 715 N.E.2d 1062.

{¶ 209} The *Sheward* court stated that "any suggestion of unity of subject matter [in H.B. 350] is illusory," that the various provisions of the act were "blatantly unrelated," and that the act's denominated subject of "laws pertaining to tort and other civil actions" was "a ruse." Id. at 498 and 499, 715 N.E.2d 1062.

---

3. Some of petitioners' arguments on the other questions regarding the products-liability statute of repose are based on *Sheward*. However, because that decision held H.B. 350 unconstitutional in toto on separation-of-powers and one-subject-rule grounds, see paragraphs two and three of the syllabus, any substantive discussion of the merits of particular tort-reform legislation within that case was dicta. See *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 52.

Furthermore, in holding H.B. 350 unconstitutional in toto, this court in *Sheward*, 86 Ohio St.3d at 499–501, 715 N.E.2d 1062, declined to follow previous decisions that had severed portions of an act that violated the one-subject rule in order to save the portions that complied with the rule. See, e.g., *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 580 N.E.2d 767 (primary subject of act was state judicial system, so parts of act concerning that subject survived; provision that was not part of that subject was severed); see also *In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335 (bill held to violate one-subject rule by inclusion of statute governing mortgages; mortgage statute severed, remaining provisions saved).

{¶ 210} In contrast, although S.B. 80 did contain a considerable number of provisions, the core of the bill, concerning amendments to this state's tort law, is sufficiently unified to comply with the one-subject rule. The products-liability statute of repose is part of that core subject. Therefore, even were we to agree with petitioners that S.B. 80 contained provisions so unrelated to its primary subject as to violate the one-subject rule, we would sever the unrelated provisions and retain the core provisions intact consistent with our precedents, and R.C. 2305.10(C) and former 2305.10(F) would not be affected. See, e.g., *Hinkle* and *Nowak*.

## F.  Conclusion of Part III

{¶ 211} In upholding the facial constitutionality of R.C. 2305.10(C) and former 2305.10(F), we join the considerable number of state and federal courts that have upheld the validity of products-liability statutes of repose.[4]  We additionally note

---

4.  See, e.g., *McIntosh v. Melroe Co.* (Ind.2000), 729 N.E.2d 972, 977 (upholding Ind.Code Ann. 34–20–3–1(b) and stating that "the General Assembly must have the authority to determine what injuries are legally cognizable, i.e., which injuries are wrongs for which there is a legal remedy"); *Love v. Whirlpool Corp.* (1994), 264 Ga. 701, 705, 449 S.E.2d 602 (upholding Ga.Code Ann. 51–1–11(b)(2) and stating that "abolishing a cause of action, before it has accrued, deprives the plaintiff of no vested right"); *Spilker v. Lincoln* (1991), 238 Neb. 188, 191, 469 N.W.2d 546 (upholding Neb.Rev.Stat.Ann. 25–224(2) and stating, " 'The immunity afforded by a statute of repose is a right which is as valuable to a defendant as the right to recover on a judgment is to a plaintiff; the two are but different sides of the same coin' " [quoting *Givens v. Anchor Packing, Inc.* (1991), 237 Neb. 565, 569, 466 N.W.2d 771] ); *Olsen v. J.A. Freeman Co.* (1990), 117 Idaho 706, 719, 791 P.2d 1285 (upholding Idaho Code 6–1403 and stating "it is the province of the legislature to modify the rules of the common law"); *Tetterton v. Long Mfg. Co., Inc.* (1985), 314 N.C. 44, 59, 332 S.E.2d 67 (upholding N.C.Gen.Stat. 1–50(6), a six-year products-liability statute of repose, and stating, " '[T]he General Assembly is the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, the statute supplants the common law rule and becomes the public policy of the State in respect to that particular matter' " [quoting *Lamb v. Wedgewood S. Corp.* (1983), 308 N.C. 419, 444, 302 S.E.2d 868] ); *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co., Inc.* (C.A.5, 2005), 419 F.3d 355, 361 (upholding Tex.Civ.Prac. & Rem.Code Ann. 16.012(b) because a plaintiff has no vested right to a cause of action).  For a survey of the cases, which includes some that have held products-liability statutes of repose unconstitutional, see

that many courts have also upheld various other types of statutes of repose as constitutional. See Annotation, Validity of Medical Malpractice Statutes of Repose (2005), 5 A.L.R.6th 133, 150 (listing cases and observing that "the facial validity of medical malpractice statutes of repose has been frequently litigated. Most courts, however, have upheld these statutes. * * * In a small number of states, however, such a statute has been found to violate constitutional requirements"); Annotation, Validity, as to Claim Alleging Design or Building Defects, of Statute Imposing Time Limitations Upon Action Against Architect, Engineer, or Builder for Injury or Death Arising out of Defective or Unsafe Condition of Improvement to Real Property (2005), 5 A.L.R.6th 497 (listing cases).

{¶ 212} It is not this court's role to establish legislative policies or to second-guess the General Assembly's policy choices. "[T]he General Assembly is responsible for weighing [policy] concerns and making policy decisions; we are charged with evaluating the constitutionality of their choices. * * * Using a *highly deferential* standard of review appropriate to a *facial challenge* to these statutes, we conclude that the General Assembly has responded to our previous decisions and has created constitutionally permissible limitations." (Emphasis sic.) *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 113.

{¶ 213} Consistent with the foregoing, we hold that R.C. 2305.10(C) and former 2305.10(F) do not violate the open-courts provision (Section 16, Article I), the Takings Clause (Section 19, Article I), the Due Process and Remedies Clauses (Section 16, Article I), the Equal Protection Clause (Section 2, Article I), or the one-subject rule (Section 15(D), Article II) of the Ohio Constitution, and are therefore facially constitutional.

## IV

### Conclusion

{¶ 214} Based on the above analysis, we answer the nine certified questions as follows:

{¶ 215} In response to questions one through three: R.C. 4123.93 and 4123.931 do not violate the Takings Clause, the Due Process and Remedies Clauses, or the Equal Protection Clause of the Ohio Constitution.

{¶ 216} In response to questions four through seven: R.C. 2305.10(C) and former 2305.10(F) do not violate the open-courts provision, the Takings Clause, the Due Process and Remedies Clauses, or the Equal Protection Clause of the Ohio Constitution.

---

Annotation, Validity and Construction of Statute Terminating Right of Action for Product–Caused Injury at Fixed Period after Manufacture, Sale, or Delivery of Product (1995), 30 A.L.R.5th 1.

{¶ 217} In response to question eight: As applied to petitioners, former R.C. 2305.10(F) does violate the ban on retroactive laws of the Ohio Constitution.

{¶ 218} In response to question nine: S.B. 80, insofar as R.C. 2305.10(C) and former 2305.10(F) are concerned, does not violate the one-subject rule of the Ohio Constitution.

So answered.

MOYER, C.J., and LUNDBERG STRATTON and CUPP, JJ., concur.

O'DONNELL, J., concurs in the answers to the certified questions only.

LANZINGER, J., concurs in the answers to the certified questions and concurs in the opinion in part.

PFEIFER, J., concurs in part and dissents in part.

---

**LANZINGER, J., concurring in part.**

{¶ 219} I write separately to question the continued vitality of *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, in light of the manner in which today's majority addresses, and ultimately disposes of, our decision in *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425. The majority claims only to limit *Brennaman* to its facts while leaving the decision intact, instead of forthrightly overruling a bad precedent.

{¶ 220} In *Galatis,* we set forth a three-part test to serve as a guide for when previous decisions should be overruled. We stated that a decision may be overruled only when "(1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it." Id. at paragraph one of the syllabus.

{¶ 221} However, as a result of strict, unwavering adherence to this test, *Galatis* jurisprudence has itself become unworkable. Over the past year, there have been numerous instances where, rather than relying on *Galatis* to overrule a prior case, we have instead chosen to limit or otherwise distinguish that case, thereby avoiding a *Galatis* analysis. See *Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420 (distinguishing but not overruling our decision in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062); *State ex rel. Shelly Materials v. Clark Cty. Bd. of Commrs.,* 115 Ohio St.3d 337, 2007-Ohio-5022, 875 N.E.2d 59 (limiting but not overruling our decision in *State ex rel. R.T.G., Inc. v. State,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998); and *Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless,* 113 Ohio St.3d 394, 2007-Ohio-2203, 865 N.E.2d 1275 (distinguishing but

not overruling our decision in *Rosette v. Countrywide Home Loans, Inc.*, 105 Ohio St.3d 296, 2005-Ohio-1736, 825 N.E.2d 599).

{¶ 222} I am now persuaded that we should move away from the rigid rules of *Galatis* as a "hopelessly random and formulaic approach to overruling precedent," *State ex rel. Shelly Materials*, 115 Ohio St.3d 337, 2007-Ohio-5022, 875 N.E.2d 59, ¶ 50 (Pfeifer, J., dissenting), and instead adopt a more flexible approach. Currently, decisions to which everyone has adjusted (they do not "def[y] practical workability") and on which anyone has relied (their abandonment would not "create an undue hardship") may not be overruled as bad precedent, no matter how wrongly decided. This "legalistic straitjacket," *Gliozzo v. Univ. Urologists of Cleveland, Inc.*, 114 Ohio St.3d 141, 2007-Ohio-3762, 870 N.E.2d 714, ¶ 19 (Pfeifer, J., dissenting), should yield to a broader system of analysis that would also allow us greater freedom and enable us to be straightforward about overruling wrongly decided cases when it is necessary.

{¶ 223} In this case, the majority describes in many pages of the opinion the reasons why *Brennaman* was wrongly decided. *Brennaman*'s lack of detail in overruling *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938, is compared to *Galatis*'s "well-structured" approach. But given a prime opportunity to apply *Galatis* and state that *Brennaman* is overruled, the majority does not actually do so. It seems strange that an opinion that goes to such great lengths to praise *Galatis* ultimately fails to apply it. If *Galatis* constrains our decisions so greatly that we cannot acknowledge cases that have clearly been wrongly decided and require overruling, then it is of questionable value itself.

{¶ 224} To serve the need for predictability, consistency, and clarity in the law, we must be forthright about overruling cases when that is our true intent and is the practical effect of a decision. Choosing to draw distinctions in order to avoid the stringent requirements of *Galatis* does not create stability. Instead, it leads to confusion, leaving parties to struggle to determine what law is controlling.

{¶ 225} Because I view our decision as effectively overruling *Brennaman*, I respectfully concur only in part.

———————

PFEIFER, J., concurring in part and dissenting in part.

{¶ 226} I dissent from this court's holding that R.C. 2305.10 is facially constitutional. I concur with the majority that R.C. 2305.10 is unconstitutional as applied to the appellant and that R.C. 4123.93 and 4123.931 are facially constitutional.

I

{¶ 227} It is hard to decide what is more offensive about the majority opinion regarding the facial constitutionality of R.C. 2305.10: how it arrives at its decision or what the decision means for Ohioans. How the decision will affect Ohioans is speculative at this point, but how the majority reaches its decision demonstrates a continued disdain for stare decisis and a propensity to engage in legal mumbo jumbo to obscure that fact.

{¶ 228} Today, the majority bases its decision on *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 551 N.E.2d 938, a case that has been overruled. It remains overruled. The case that overruled *Sedar* and declared statutes of repose unconstitutional pursuant to Section 16, Article I of the Ohio Constitution, *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425, remains in effect. Somehow, it does not control this case. This court's decision in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, which reiterated our holding in *Brennaman* when the General Assembly once again imposed statutes of repose, is ignored. What has changed since this court last overruled statutes of repose in 1994 and 1999? Not the language of the statutes in question and not the Ohio Constitution.

{¶ 229} That this court was clear and blunt in *Brennaman* was no sin. Section 16, Article I of the Ohio Constitution is also clear and blunt: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

{¶ 230} As we said in *Brennaman*, "This section of the Ohio Constitution protects the right to seek redress in Ohio's courts when one is injured by another." 70 Ohio St.3d at 466, 639 N.E.2d 425. *Brennaman* relied in part upon this court's decision in *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 609 N.E.2d 140, in which "this court held that the General Assembly is constitutionally precluded from depriving a claimant of a right to a remedy 'before a claimant knew or should have known of her injury.'" *Brennaman*, 70 Ohio St.3d at 466, 639 N.E.2d 425, quoting *Burgess*, 66 Ohio St.3d at 61, 609 N.E.2d 140. *Burgess*, in turn, relied upon "a line of cases including *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717, *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 512 N.E.2d 626, and *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709, [in which] this court established a threshold point at which government may impose a statute of limitations on a potential claimant. That line of decisions established that a statute of limitations could not begin to run before a claimant knew or should have known of her injury." *Burgess*, 66 Ohio St.3d at 60–61, 609 N.E.2d 140.

{¶ 231} As recently as two months ago, *Brennaman* was cited as authority by this court. In *Arbino v. Johnson & Johnson,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 44, the majority opinion cited *Brennaman* as an example of how this court has defined the rights associated with Section 16, Article I. The majority called this court's interpretation "well settled":

{¶ 232} "The definition of these rights is well settled. 'When the Constitution speaks of remedy and injury to person, property, or reputation, it requires an opportunity granted at a meaningful time and in a meaningful manner.' *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 47, 512 N.E.2d 626. We have interpreted this provision to prohibit statutes that effectively prevent individuals from pursuing relief for their injuries. See, e.g., *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 466, 639 N.E.2d 425 (finding a statute of repose unconstitutional because it deprived certain plaintiffs of the right to sue before they were aware of their injuries) * * *."

{¶ 233} For good measure, the *Arbino* majority cited *Brennaman* yet again later in the opinion:

{¶ 234} "This right [to a remedy in an open court] protects against laws that completely foreclose a cause of action for injured plaintiffs or otherwise eliminate the ability to receive a meaningful remedy. See *Brennaman,* 70 Ohio St.3d at 466, 639 N.E.2d 425." *Arbino,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 96.

{¶ 235} The preceding paragraph should have controlled this case. But, in two months, *Brennaman* has morphed from a case worthy of citation as part of this court's well-settled jurisprudence regarding Section 16, Article I of the Ohio Constitution to an object of derision by basically the same majority that relied upon it in *Arbino.*

{¶ 236} The majority states that stare decisis is " 'limited to circumstances "where the facts of a subsequent case are substantially the same as a former case," ' " quoting *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 5, 539 N.E.2d 103. In considering R.C. 4123.93 and 4123.931, the workers' compensation subrogation statutes at issue in this case, the majority does indeed describe the significant differences between those statutes and the statutes reviewed in *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 748 N.E.2d 1111. However, the majority makes no attempt to distinguish the statute of repose contained in R.C. 2305.10 from the one at issue in *Brennaman*—because there is no significant difference, and because *Brennaman* so clearly and so inconveniently spells out that statutes of repose are unconstitutional in Ohio.

{¶ 237} The majority cites *Brennaman* as an illustration of the kind of "unstructured approach to overruling a precedent" that led to the more "disci-plined" approach set forth in *Westfield v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-

5849, 797 N.E.2d 1256. That approach necessarily includes an application of the talismanic *Galatis* factors. But the majority, in its attempted de facto overruling of *Brennaman,* employs none of the *Galatis* factors. Instead, it resorts to jurisprudence by insult. The author, who calls for civility in judicial opinions not her own (*State ex rel. Ohio Gen. Assembly v. Brunner,* 114 Ohio St.3d 386, 2007-Ohio-3780, 872 N.E.2d 912, ¶ 87), calls *Brennaman* "the classic example of the 'arbitrary administration of justice' that *Galatis* cautions against" and claims that "personal judicial whims" drove the result. Does the majority really believe that this court decided *Brennaman* arbitrarily, on a whim? Does the majority really mean to suggest that *Brennaman* was written on impulse, resulting from a sudden, capricious idea? Or is the majority simply forced to insult this court's work in *Brennaman* because it has no basis to overrule it given the "judicial straitjacket" the majority zipped itself into in *Galatis*? Does the majority mean to likewise insult the supreme courts of other states that have found statutes of repose unconstitutional? See *Heath v. Sears, Roebuck & Co.* (1983), 123 N.H. 512, 464 A.2d 288; *Lankford v. Sullivan, Long & Hagerty* (Ala.1982), 416 So.2d 996; *Hazine v. Montgomery Elevator Co.* (1993), 176 Ariz. 340, 861 P.2d 625; *Battilla v. Allis Chalmers Mfg. Co.* (Fla.1980), 392 So.2d 874; *Perkins v. Northeastern Log Homes* (Ky.1991), 808 S.W.2d 809; *Hanson v. Williams Cty.* (N.D.1986), 389 N.W.2d 319; *Kennedy v. Cumberland Eng. Co.* (R.I.1984), 471 A.2d 195; *Berry v. Beech Aircraft Corp.* (Utah 1985), 717 P.2d 670.

{¶ 238} The majority repeats the bromide that "the legislative branch is 'the ultimate arbiter of public policy,' " quoting *Arbino,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 21. The governor, with his role in setting the public policy agenda and armed with a veto, might dispute that characterization. This court, as the steward of the ever-developing common law, also plays a vital role. But even accepting the majority's characterization of the legislature's role, the General Assembly may reach only as far as the Constitution allows. This court is the ultimate arbiter of what is constitutional.

{¶ 239} I do not agree that this court owes all legislation passed by the General Assembly the presumption of constitutionality. This presumption, regrettably employed even by me in a few majority opinions, has no basis in the Constitution. Our role is to determine constitutionality, and we undermine our constitutional role by accepting any impingement on that power by any other branch of government.

{¶ 240} In *Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, this court held that the General Assembly's attempt to subvert this court's decision in *Brennaman* by again passing statutes of repose was unconstitutional. In 1996 Am.Sub.H.B. No. 350, the collection of statutes at issue in *Sheward,* the General Assembly reenacted the statute overturned in *Brennaman* as a 15–year statute of repose

with certain exceptions, provided for a 15–year statute of repose for wrongful-death actions involving a products-liability claim, a 15–year statute of repose for products-liability claims, a six-year statute of repose for professional malpractice claims other than medical, and a six-year statute of repose for medical malpractice claims. See *Sheward*, 86 Ohio St.3d at 476, 715 N.E.2d 1062. This court wrote that "[i]n enacting and/or amending these sections, the General Assembly chose to usurp this court's constitutional authority by refusing to recognize our holdings in *Brennaman, Cyrus* [*v. Henes* (1994), 70 Ohio St.3d 640, 640 N.E.2d 810], and *Ross* [*v. Tom Reith, Inc.* (1995), 71 Ohio St.3d 563, 645 N.E.2d 729]." Id.

{¶ 241} In rejecting the General Assembly's attempt to reintroduce statutes of repose, the *Sheward* court wrote:

{¶ 242} "The following language from *Bartlett* [*v. State* (1905), 73 Ohio St. 54, 58, 75 N.E. 939], has particular force here:

{¶ 243} " 'It is sufficient to say that we adhere to [our prior] ruling [declaring acts to be in violation of the constitution]; and that the sections of the statutes now under consideration do not stop short of being a mandate to all of the courts [to accept as legal that which we have declared unconstitutional]. This we regard as wholly beyond the power conferred upon the general assembly by the constitution. The power conferred upon the general assembly is legislative power, and that body is expressly prohibited from exercising any judicial power which is not expressly conferred by the constitution. Article 2, section 32.

{¶ 244} " 'At this time, the limits of the power invested in the respective co-ordinate branches of the government [are] so well defined and so generally understood, that we are constrained to believe that, whatever may have been the thought of the persons who drafted them, the enactment of these sections was an inadvertence on the part of the general assembly; for it is well settled that the legislature cannot annul, reverse or modify a judgment of a court already rendered, nor require the courts to treat as valid laws those which are unconstitutional. If this could be permitted the whole power of the government would at once become absorbed and taken into itself by the legislature.' " *Sheward*, 86 Ohio St.3d at 477–478, 715 N.E.2d 1062.

{¶ 245} *Sheward* 's discussion on statutes of repose concluded with an admonition ignored by the majority in this case: "While some members of this court, now and in the past, may disagree with the holding in *Brennaman*, no member of this court can, consistent with his or her oath of office, find that the General Assembly has operated within the boundaries of its constitutional authority by brushing aside a mandate of this court on constitutional issues as if it were of no consequence. Indeed, the very notion of it threatens the judiciary as an

independent branch of government and tears at the fabric of our Constitution." *Sheward,* 86 Ohio St.3d at 478, 715 N.E.2d 1062.

{¶ 246} And so it goes.

{¶ 247} I would also hold that R.C. 2305.10 violates the Equal Protection Clause of the Ohio Constitution. Section 2, Article I guarantees that citizens shall not be denied equal protection of the law. When the legislation at issue creates classifications involving a fundamental right, it becomes the subject of strict judicial scrutiny and will be upheld only upon a showing that it is justified by a compelling state interest. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 423, 633 N.E.2d 504.

{¶ 248} In R.C. 2305.10(C), the General Assembly allows a person injured nine years after purchasing a product to assert a cause of action against the manufacturer, but bars a person injured ten years after purchasing a product from bringing the same claim. R.C. 2305.10 takes from one class of potential plaintiffs a fundamental right—the right to a remedy. The General Assembly has failed to assert a compelling state interest to legitimize that distinction.

{¶ 249} The majority applies a rational-basis review to R.C. 2305.10, finding that the statute does not implicate a fundamental right. Even under that standard of review, R.C. 2305.10 fails. In its "statement of findings and intent," found in Section 3(C) of 2004 Am.Sub.H.B. No. 80, the General Assembly unsuccessfully attempts to articulate a rational basis for the statute's distinctions. The majority seems satisfied that the General Assembly bothered to create a "statement of findings and intent," applying no analysis to the statement itself, other than quoting it and essentially saying, "Sounds good to us."

{¶ 250} The statement proclaims that subsequent to the delivery of the product, the manufacturer or supplier loses control over the product and that it is more appropriate for the party in control of the product during the intervening time period to be responsible for any harm caused by the product. But that loss of control happens immediately, not at the ten-year mark.

{¶ 251} The General Assembly attempts to legitimize the ten-year distinction by stating, without any support, that more than ten years after delivery, "it is very difficult for a manufacturer or supplier to locate reliable evidence and witnesses regarding the design, production, or marketing of the product." S.B. 180, Section 3(C)(5). However, the expiration of the statute of repose is an affirmative defense. Thus, the burden will still be on the manufacturer to produce records showing that the product in question has been out of its hands for a period of more than ten years. In the absence of such a showing, there can be no affirmative defense. Thus, manufacturers will need to continue to maintain records. Second, the absence of records regarding a product is a greater handicap to a plaintiff trying to prove a defect than it is to the manufacturer. In

a products-liability case, the burden of proof is on the plaintiff to show that the product in question is defective.

{¶ 252} The General Assembly suggests that the statute of repose will prevent the inappropriate application of current technological standards to older products. S.B. 80, Section 3(C)(6). This is a solution to a problem that does not exist. There is no statutory or case law that requires an older product to conform to current technological standards in a products-liability case.

{¶ 253} The General Assembly also claims that the statute of repose will "enhance the competitiveness of Ohio manufacturers." Section 3(C)(7). However, one of the actual effects of the statute of repose in this case is to allow an out-of-state manufacturer to escape liability. Meanwhile, Groch's Ohio employer, General Motors, remains completely liable and without any way to seek indemnification or contribution from the out-of-state manufacturer of the product that caused Groch's injuries. Thus, in this case, the statute of repose is actually harming a company manufacturing in Ohio.

{¶ 254} Any serious review of the General Assembly's "statement of findings and intent" would show that the statement is devoid of factual findings. Whether the statement is honest about the General Assembly's real intent is dubious. In any case, it does not set forth a rational basis for discriminating against certain victims of defective products.

## II

{¶ 255} We do not know yet the full impact of this case on Ohioans. We only know of its potential. Potentially, R.C. 2305.10 affects anyone who drives a car, crosses a bridge, rides an elevator, flies or rides in an airplane, utilizes a medical device, paints, mows grass, uses tools, or depends at all on any product in his or her daily existence. As an example, we can look to Minnesota and the aftermath of the recent I–35 bridge collapse. Early indicators are that the bridge's collapse may have originated with the failure of gusset plates that were sized too thin in the bridge's original 1960s design. http://www.startribune.com/local/13796646. html. The bridge collapse presents an example of a design that was flawed ab initio; the bridge's eventual collapse was built into it and was not the result of degrading materials. In Ohio, under the majority's view, none of the victims of the collapse could recover against the designer of the bridge or the supplier of the gusset plates. In Ohio, if the collapse were due to substandard concrete or steel, those suppliers would escape liability if the bridge had been able to remain standing for merely a decade.

{¶ 256} We can look to the past to the infamous Ford Pinto, which had an alleged design flaw that made the car susceptible to bursting into flames upon a rear-end collision. In reviewing a jury verdict that found Ford liable for injuries

suffered in such an accident, the court in *Grimshaw v. Ford Motor Co.* (1981), 119 Cal.App.3d 757, 813, 174 Cal.Rptr. 348, found:

{¶ 257} "Through the results of the crash tests Ford knew that the Pinto's fuel tank and rear structure would expose consumers to serious injury or death in a 20- to 30-mile-per-hour collision. There was evidence that Ford could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits. Ford's institutional mentality was shown to be one of callous indifference to public safety. There was substantial evidence that Ford's conduct constituted 'conscious disregard' of the probability of injury to members of the consuming public."

{¶ 258} Again, with the Pinto, the injury-causing flaw was part of the original design of the vehicle. It was not Ford's lack of control over the product that led to the plaintiff's injuries; rather, the accident exposed the flaw that was in the Pinto to begin with. In Ohio, no matter what Ford knew or when it knew it, if the accident occurred after ten years from delivery, a plaintiff could have no recovery.

{¶ 259} Finally, we can look to the details of R.C. 2305.10, and the exceptions the General Assembly has carved out for certain products. The statute of repose contained in R.C. 2305.10(C) does not apply to certain claims—where symptoms tied to exposure often arise beyond ten years after exposure—involving the products described in R.C. 2305.10(B)(1) (hazardous or toxic chemicals, ethical drugs, or ethical medical devices), (B)(2) (chromium), (B)(3) (chemical defoliants or herbicides, including agent orange), and (B)(4) (diethylstilbestrol or other nonsteroidal synthetic estrogens). R.C. 2305.10(C)(7). Presumably, the General Assembly excepted these products because they have been proven to cause injuries years after a potential plaintiff was exposed to them. Products causing delayed injuries exist. Can we assume that the limited list of products in R.C. 2305.10(B) accounts for all such products? We should not. What is the product used by Ohioans today that will fail a decade from now? What is the product used by Ohioans today that is causing damage that will not be revealed until a decade from now? We cannot know. It is a harrowing thought that the products we use today that may be ticking time bombs—be they food additives, cell phones, automobiles—after ten years can leave us profoundly injured with no hope of recovery against the tortfeasor. For manufacturers, the bomb stops ticking at ten years. For Ohio's consumers, once but no longer protected by the Ohio Constitution, the ticking continues.

Gallon, Takacs, Boissoneault & Schaffer Co., L.P.A., Kevin J. Boissoneault, Theodore A. Bowman, and Russell Gerney, for petitioners.

Kerger & Associates and Kimberly Conklin; Lathrop & Gage L.C. and Patrick N. Fanning, for respondent General Motors Corporation.

Gallagher Sharp, Robert H. Eddy, and Colleen A. Mountcastle, for respondents Kard Corporation and Racine Federated, Inc.

Marc Dann, Attorney General, Elise W. Porter, Acting State Solicitor, and Stephen P. Carney, Deputy State Solicitor, for respondent state of Ohio.

Paul W. Flowers, Co., L.P.A., and Paul W. Flowers, in support of petitioners for amicus curiae Ohio Academy of Trial Lawyers.

Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy, and Marc J. Jaffy, in support of petitioners for amicus curiae Ohio AFL–CIO.

Squire, Sanders & Dempsey, L.L.P., Steven M. Loewengart, and Johnathan E. Sullivan, in support of respondents for amicus curiae COSE Group Services, Inc.

Shook, Hardy & Bacon, L.L.P., Victor E. Schwartz, and Mark A. Behrens, in support of respondents for amici curiae National Federation of Independent Business Legal Foundation, Chamber of Commerce of the United States of America, National Association of Manufacturers, American Tort Reform Association, Property Casualty Insurers Association of America, American Chemistry Council, National Society of Professional Engineers, NPES Association for Suppliers of Printing, Publishing and Converting Technologies, National Association of Mutual Insurance Companies, and Association of Equipment Manufacturers.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, and Anne Marie Sferra, in support of respondents for amicus curiae Ohio Alliance for Civil Justice.

Porter, Wright, Morris & Arthur, L.L.P., Carolyn A. Taggart, and J.H. Huebert, in support of respondents for amicus curiae Ohio Association of Civil Trial Attorneys.

Garvin & Hickey, L.L.C., Preston J. Garvin, and Michael J. Hickey, in support of respondents for amicus curiae Ohio Chamber of Commerce.

Bricker & Eckler, L.L.P., and Thomas R. Sant, in support of respondents for amici curiae Ohio Chapter of the National Federation of Independent Business and Ohio Manufacturers Association.

Vorys, Sater, Seymour & Pease, L.L.P., and Robert A. Minor, in support of respondents for amicus curiae Ohio Self–Insurers Association.